**PUERTO RICO TELEPHONE COMPANY, Plaintiff, Appellant,**

v.

**TELECOMMUNICATIONS REGULATORY BOARD OF PUERTO RICO** and Cellular Communications of Puerto Rico, Inc., Defendants, Appellees.

No. 98–2228.

United States Court of Appeals, First Circuit.

Heard June 7, 1999.

Decided Aug. 19, 1999.

**4**

Philip J. Mause, with whom Joaquín A. Márquez, Jeffrey J. Lopez, and Drinker Biddle & Reath LLP were on brief, for appellant.

Robert F. Reklaitis, with whom Veronica M. Ahern, Laurin H. Mills, Lydia P.A. Turnipseed, Nixon, Hargrave, Devans & Doyle LLP, Jose R. Gaztambide, and Gaztambide & Plaza were on brief, for appellee Telecommunications Regulatory Board of Puerto Rico.

William A. Davis, with whom Sara F. Seidman, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC, and Francisco Silva were on brief, for appellee Cellular Communications of Puerto Rico, Inc.

Donald B. Verrilli, Jr., Jodie L. Kelley, Katherine A. Fallow, Jenner & Block, Thomas F. O'Neil III, Adam H. Charnes, and Mark B. Ehrlich on brief for amicus curiae MCI Worldcom, Inc.

Before LYNCH, Circuit Judge, NOONAN, Senior Circuit Judge,* and LIPEZ, Circuit Judge.

* Of the Ninth Circuit, sitting by designation.

LYNCH, Circuit Judge.

This appeal raises tricky questions of the limits on federal court jurisdiction under 47 U.S.C. § 252(e)(6), a provision of the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56.

Two telecommunications companies (one primarily a landline local exchange carrier and one a cellular carrier) reached an interconnection agreement; the agreement in turn was approved by the Telecommunications Regulatory Board of Puerto Rico ("the Board") under the Act. A dispute arose over responsibility for certain charges and the landline company, Puerto Rico Telephone Company ("PRTC"), started charging its customers long-distance rates for calls to the cellular phone company's customers. The cellular company, Cellular Communications of Puerto Rico, Inc. ("CCPR"), struck back, filing a complaint with the Board. The Board found that PRTC had not violated the agreement but nonetheless had violated its obligations of prior notice to its customers under Puerto Rico law. The Board ordered PRTC to make refunds. Faced with the loss of an alleged several million dollars in revenue, PRTC sued in federal court, raising claims under the Act and under the Constitution.

Focusing closely on the particular facts, as alleged by PRTC, of the dispute between PRTC, CCPR, and the Board, we conclude that § 252(e)(6) does not provide the federal courts with jurisdiction over PRTC's claims. That is because the challenged Board order lacks a sufficient nexus with the parties' interconnection agreement to be a determination which is subject to review; also, the provision for federal judicial review does not authorize review of Board actions for compliance with Puerto Rico law. We further conclude that PRTC's takings and procedural due process causes of action fail to state a claim on which relief can be granted. We therefore affirm the dis-

missal of all claims, on different reasoning than that of the district court.[1]

## I

PRTC's complaint and the attached exhibits state the following facts. CCPR makes use of PRTC's landline network to route and complete calls. When a landline PRTC customer places a call to a CCPR cellular customer, PRTC routes the call over its landline facilities to CCPR's switch, and CCPR then forwards the call to its final destination. At the times relevant to the complaint, the CCPR switch was in San Juan, and so calls from PRTC customers to CCPR customers originating outside San Juan were long-distance toll calls, regardless of the location in which the call was ultimately received.

For some time, CCPR paid PRTC a per-minute fee for delivering these long-distance calls, and PRTC did not bill its customers any long-distance charges. When the Telecommunications Act of 1996 was enacted, the parties worked out new arrangements. After engaging in extensive negotiations and an arbitration, PRTC and CCPR reached an "interconnection agreement," which provided in paragraph IV that PRTC customers would be charged the applicable long-distance rates unless CCPR chose to pay PRTC a fee for each call or chose to have PRTC charge its customers a flat rate of 35 cents for each call. The agreement was executed on September 2, 1997 and approved by the Board on September 11, 1997. The Board stated that the agreement was "consistent with section 252 of the Act, local law, and the rules of this Board," as well as "non-discriminatory and ... consistent with the public interest, convenience and necessity."

CCPR never exercised either one of its options under paragraph IV of the agreement. In November 1997, PRTC began charging its customers long-distance charges for the relevant calls, retroactive to September 2, 1997. Customers complained. On November 25, 1997, CCPR filed a complaint with the Board seeking a cease and desist order prohibiting PRTC from imposing these charges. This matter was captioned "In the matter of Enforcement and Implementation of the Interconnection Agreement between [CCPR] and [PRTC]."

CCPR says that PRTC imposed these charges, and so angered customers who sought to call CCPR's customers, to hurt CCPR and did so out of self-interested and anti-competitive motivations. PRTC, which has an affiliate that provides cellular phone services in competition with CCPR, denies this.

The Board held hearings on CCPR's complaint on December 10 and 15, during which numerous witnesses testified. On December 22, 1997, the Hearing Examiner made a recommendation to the Board. The Examiner stated that paragraph IV of the agreement "gives PRTC the right to charge the toll charges at issue to its landline customers when they call a CCPR subscriber" and that under the circumstances of the case PRTC acted properly under the agreement. However, the Examiner also found that "[e]ven though PRTC has the right, in principle, under the Interconnection Agreement, to impose toll charges, it is also legally and morally obligated to provide adequate notice to its customers," who were not parties to the agreement but with whom PRTC had a separate contractual relationship, "before assessing said charges." The Examiner concluded that PRTC had imposed charges without notice in violation of Article 1210 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 3375, which establishes a duty to act in good faith while fulfilling

1. The Board belatedly raised an Eleventh Amendment defense in a letter to the court filed after briefs had been submitted, then expressly withdrew that defense at oral argument. Accordingly, we do not consider the Eleventh Amendment. *See Parella v. Retirement Bd. of the Rhode Island Employees' Retirement Sys.*, 173 F.3d 46, 55–57 (1st Cir. 1999).

contract obligations, and "thereby breach[ed] its fiduciary, contractual relationship with its customers which requires acting in good faith towards them." The Examiner stated that PRTC could prospectively assess toll charges "only after adequate and reasonable notification to its customers," and suggested that thirty days advance notice would be reasonable.

On December 24, 1997, the Board adopted this recommendation and issued an order requiring PRTC to cease collecting the charges and to credit or refund the charges it had already collected. As of that date, the issue of any future long-distance charges was already moot (as the Board recognized), because PRTC and CCPR had set up new switches allowing calls to be transferred from PRTC to CCPR at local offices outside San Juan. Consequently, this case involves only charges imposed by PRTC on its customers for calls made between September 2 and December 22, 1997.

PRTC filed its federal court complaint against the Board and CCPR on December 31, 1997. In addition to several state law claims, the complaint sets forth four federal causes of action. The first, styled "review of decision disapproving or revising interconnection agreement," alleges that "under 47 U.S.C. § 252(e)(6)" the district court has jurisdiction over decisions of the Board "reviewing interconnection agreements"; that the Board's decision "is tantamount to a review and rejection of an important term of the Agreement between PRTC and CCPR" that permits PRTC to impose the long-distance charges; and that the Board's decision violates both Puerto Rico law and the Act because it is inequitable and unreasonable, does not provide PRTC with compensation for the provision of services, and does not rely on a reason for rejection that the Act permits.

The second cause of action is captioned "enforcement of interconnection agreement." PRTC alleges that the defendants

"have taken actions which make it impossible for PRTC to obtain benefits it is entitled to under the [a]greement," that the federal courts have jurisdiction "under 47 U.S.C. § 252(e)(6)" over an action to enforce an approved interconnection agreement, and that PRTC seeks such enforcement.

The third cause of action claims an unconstitutional taking. According to PRTC, "[b]y prohibiting PRTC from charging its customers—or anyone else—for providing a service and requiring PRTC to pay CCPR every time PRTC performs the service, the Board ... has effected a taking of PRTC's property without just compensation."

The fourth cause of action alleges that the Board's action was "taken under color of the law of the Commonwealth of Puerto Rico without an adequate hearing or opportunity for a hearing" and "deprives PRTC of important property rights without due process of law."

After both defendants moved to dismiss pursuant to Rule 12(b)(1) and Rule 12(b)(6), the district court held that it lacked subject matter jurisdiction over the first two causes of action and that the third and fourth causes of action did not state claims on which relief could be granted. *See Puerto Rico Tel. Co. v. Telecommunications Regulatory Bd. of Puerto Rico,* 20 F.Supp.2d 308, 312 (D.P.R.1998). The court dismissed the action, implicitly declining supplemental jurisdiction over PRTC's state law claims.

The district court based its jurisdictional holding on 47 U.S.C. § 252(e)(6), which states in relevant part:

> In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement [2] meets the requirements of section 251 of this title and this section.

---

**2.** "[S]tatement" here refers to a "statement of generally available terms," which is not relevant to the case at hand.

The court stated that "a state commission to which an arbitrated interconnection agreement is submitted must approve or reject the agreement, and section 252(e)(6) allows for federal jurisdiction only for review of the state commission's decision in that context." *Id.* at 310. The court concluded that it lacked jurisdiction because the Board's order was based purely on state law and was "not an approval or disapproval of the Agreement or a rule regarding the Agreement's conformity with 47 U.S.C. § 251," whereas "[t]his court has subject matter jurisdiction under the Act only when a state regulator applies federal law in its acceptance or rejection of an interconnection agreement." *Id.* at 311. The court distinguished *Michigan Bell Telephone Co. v. MFS Intelenet of Michigan, Inc.*, 16 F.Supp.2d 817 (W.D.Mich. 1998), on the ground that in that case plaintiff alleged that the state commissioners' order "interpreted the interconnection agreement ... in a manner which violated *federal law.*" *Puerto Rico Tel. Co.*, 20 F.Supp.2d at 311 (emphasis in original).

The district court also held that plaintiff's procedural due process claim failed because, although PRTC claimed that the Board's order "violated specific procedures of the Act regarding the approval and rejection of interconnection agreements," these procedures were not applicable because the order did not in fact reject the agreement at all. *Id.* Finally, the court held that PRTC had not stated a takings claim because it had "not made sufficient allegations to allow [the court] to find a recognized property interest which has been taken from it. PRTC did not have a recognized property right in retroactively billing its customers, and the Board's prevention of this action is not a taking within the meaning of the Fifth Amendment." *Id.* at 311–12.

 The district court's ruling that it lacked subject matter jurisdiction is subject to de novo review, *see Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995); *Heno v. FDIC*, 20 F.3d 1204, 1205 (1st Cir.1994), as is its decision to dismiss the takings and procedural due process causes of action for failure to state a claim, *see Grunbeck v. Dime Sav. Bank of New York*, 74 F.3d 331, 335 (1st Cir.1996). We read the allegations of the complaint liberally, treating all well-pleaded facts as true and taking all inferences in favor of the plaintiff. *See Negron–Gaztambide v. Hernandez–Torres*, 35 F.3d 25, 27 (1st Cir. 1994); *see also Aversa v. United States*, 99 F.3d 1200, 1209–10 (1st Cir.1996). Further, we are "mindful that the party invoking the jurisdiction of a federal court carries the burden of proving its existence." *Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 60 (1st Cir.1993).

## II

### A. Telecommunications Act Claims

#### 1. Structure of the Act

PRTC's claims are best understood against an explanation of the structure of the relevant portions of the Act.

The Act is designed to foster the rapid development of competition in the local telephone services market. *See* Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56, 56 (stating that the purpose of the Act is "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies"); *AT & T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, ——, 119 S.Ct. 721, 726, 142 L.Ed.2d 835 (1999); *Reno v. American Civil Liberties Union*, 521 U.S. 844, 857–58, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). As the legislative history explains, the Act creates "a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all

Americans by opening all telecommunications markets to competition." H.R. Conf. Rep. No. 104–458, at 113 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124, 124 (Joint Explanatory Statement of the Committee of Conference); *see also* Bruning, *The Telecommunications Act of 1996: The Challenge of Competition*, 30 Creighton L.Rev. 1255, 1256 (1997) (describing the Act as intended "(1) to promote competition and reduce regulation to secure lower prices and higher quality services for American telecommunications consumers, (2) to encourage the rapid deployment of new telecommunications technologies, and (3) to implement policies that will prevent harm to consumers from the implementation of competition"). Sections 251, 252, and 253 of the Act contain the principal provisions designed to carry out these policies.

Section 251 imposes various requirements on telecommunications carriers, such as CCPR, and incumbent local exchange carriers, such as PRTC. For instance, all carriers have a duty "to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers." 47 U.S.C. § 251(a)(1). An incumbent carrier, which controls the existing network to which other carriers need access in order to compete, also has the duty to permit other carriers to interconnect with its facilities, to provide other carriers with access to elements of its local network on an "unbundled" basis, to sell to other carriers at wholesale prices the services that it provides to its customers, and to negotiate interconnection agreements in good faith. *Id.* § 251(c). The Act is also an exercise in what has been termed cooperative federalism: "In prescribing and enforcing regulations to implement the requirements of [§ 251], the [FCC] shall not preclude the enforcement of any regulation, order, or policy of a State commission that ... establishes access and interconnection obligations of local exchange carriers; ... is consistent with the requirements of this section; and ... does not sub-

stantially prevent implementation of the requirements of this section and the purposes of this part." *Id.* § 251(d)(3).

Section 252, which is captioned "[p]rocedures for negotiation, arbitration, and approval of agreements," sets forth some of the means to implement these various requirements. First, the incumbent carrier and the requesting carrier have the opportunity to negotiate their own interconnection agreement. If those carriers can reach a compromise, they need not satisfy the substantive requirements of § 251(b) and (c). *See id.* § 252(a)(1). If they cannot agree within a certain period, either of the carriers may petition the state commission to arbitrate unresolved issues. *See id.* § 252(b)(4). Finally, the completed agreement must be submitted to the state commission for approval. *See id.* § 252(e)(1). The commission may reject a negotiated agreement that is "not consistent with the public interest, convenience, and necessity" or that "discriminates against a telecommunications carrier not a party to the agreement," *id.* § 252(e)(2)(A), and may reject an arbitrated agreement that fails to meet the requirements of § 251 (including the FCC's implementing regulations) or § 252(d) (which governs pricing standards), *see id.* § 252(e)(2)(B). Further, notwithstanding these strictures on the grounds for rejection, "but subject to section 253 of this title," a state commission is not prohibited "from establishing or enforcing other requirements of State law in its review of an agreement, including requiring compliance with intrastate telecommunications service quality standards or requirements." *Id.* § 252(e)(3).

Section 252 also provides for federal judicial review of certain state commission actions relating to interconnection agreements. Section 252(e)(6) provides: "In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate

Federal district court to determine whether the agreement ... meets the requirements of section 251 of this title and this section." *Id.* § 252(e)(6). Also, § 252(e)(4), which sets forth the schedule for state commission approval or rejection, provides that "[n]o State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section." *Id.* § 252(e)(4).

Section 253, which is not restricted to matters relating to interconnection agreements, requires the FCC to preempt the enforcement of state and local laws that "may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." *Id.* § 253(a), (d). Like § 251 and § 252, § 253 also contains provisions that preserve state regulatory authority: "Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section [which sets forth 'universal service' provisions], requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers." *Id.* § 253(b); *see also id.* § 253(c).[3]

 Against this background, we test PRTC's attempt to assert federal jurisdiction. Section 252(e)(6) is PRTC's sole basis for its assertion of subject matter juris-diction over its Telecommunications Act claims.[4] In interpreting this provision, we "will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute ... and the objects and policy of the law." *Stafford v. Briggs*, 444 U.S. 527, 535, 100 S.Ct. 774, 63 L.Ed.2d 1 (1980) (quoting *Brown v. Duchesne*, 60 U.S. (19 How.) 183, 194, 15 L.Ed. 595 (1900)) (internal quotation marks omitted); *see also, e.g., Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990).

## 2. Application of the Act to PRTC's Claims

Given the nature of PRTC's claims, § 252(e)(6) does not confer federal juris-diction here.

It is clear that this provision covers approvals or rejections by state commissions of interconnection agreements, but that is not what is involved here. It is less clear whether the provision also covers "determination[s]" that are not approvals or rejections. Even if the Act permits federal judicial review of such determinations, there is no federal jurisdiction over this case. The portion of the Board's order as to which PRTC is aggrieved does not have a sufficient nexus to the interconnection agreement between PRTC and CCPR to be a "determination" under § 252 and so to fall within the jurisdiction-

3. Other such savings of state authority are included in the Act. *See, e.g., id.* § 261 ("Nothing in this part ['Development of Competitive Markets'] shall be construed to prohibit any State commission from enforcing regulations ... or from prescribing regulations ..., in fulfilling the requirements of this part, if such regulations are not inconsistent with the provisions of this part.... Nothing in this part precludes a State from imposing requirements on a telecommunications carrier for intrastate services that are necessary to further competition in the provision of telephone exchange service or exchange access, as long as the State's requirements are not inconsistent with this part or the [FCC's] regulations to implement this part.").

4. Amicus MCI Worldcom, Inc. contends that the district court also had jurisdiction over these claims under 28 U.S.C. § 1331, the general federal question statute, but we do not address this argument because PRTC does not make it. Further, § 1331 is not asserted as a basis for jurisdiction over these two claims in PRTC's complaint. *See PCS 2000 LP v. Romulus Telecomms., Inc.*, 148 F.3d 32, 35 (1st Cir.1998) ("[I]t is black-letter law that jurisdiction must be apparent from the face of the plaintiffs' pleading ...." (quoting *Viqueira v. First Bank*, 140 F.3d 12, 18 (1st Cir.1998)) (internal quotation marks omitted)).

al bounds of § 252(e)(6).[5] Even assuming that there were an adequate nexus, PRTC's claims in the end amount to an assertion that the Board failed to comply with state law provisions. There is no federal jurisdiction over such claims.

### a. "[D]etermination" under § 252

As an initial matter, PRTC's contention that the Board's order amounted to a rejection of the parties' interconnection agreement is simply wrong. There is no dispute that the Board approved the interconnection agreement in September 1997, and that it stated in its December order that PRTC was entitled under the agreement to impose the disputed charges. The agreement remained in effect at all times. The Board objected, under Puerto Rico law, to the manner in which PRTC chose to impose the charges, a matter that was not covered by the agreement and that affected people who were not parties to the agreement.[6]

Another issue presented by the parties is not necessary for resolution of this case. The parties vigorously argue about whether § 252(e)(6) confers federal court jurisdiction over state commission "determination[s]" that are interpretations of, enforcements of, or refusals to enforce existing interconnection agreements. Alone among the parties, the Board contends that only its orders approving or rejecting agreements are subject to federal judicial review. Both PRTC and CCPR (otherwise adverse), as well as amicus curiae MCI Worldcom, Inc., contend that federal judicial review is broader. There is some support for the broader view. Several courts have held that interpretations and enforcements of agreements are implicitly covered by § 252 and so are also covered by § 252(e)(6). *See Illinois Bell Tel. Co. v. Worldcom Techs., Inc.,* 179 F.3d 566, 569–71 (7th Cir.1999); *Iowa Utilities Bd. v. FCC,* 120 F.3d 753, 804 & n. 24 (8th Cir.1997) (stating in dicta that "[w]e believe that the enforcement decisions of state commissions would also be subject to federal district court review under subsection 252(e)(6)"), *aff'd in part and rev'd in part on other grounds, AT & T Corp. v. Iowa Utilities Bd.,* 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). We need not and do not decide this issue; we assume *arguendo,* in PRTC's favor, that review under § 252(e)(6) is not limited to initial acceptances and rejections of agreements.

Nevertheless, § 252(e)(6), which authorizes review in cases in which "a State commission makes a determination under [§ 252]," clearly requires at least a substantial nexus between the commission's determination and an interconnection agreement. The whole subject of § 252 is such agreements—the procedure for putting them into place, the standards for the prices they contain. "[D]etermination" is used elsewhere in § 252 to refer to decisions about the specific provisions of agreements, such as the rates they will specify. *See* 47 U.S.C. § 252(d)(1) (discussing "[d]eterminations by a State commission of the just and reasonable rate for the interconnection of facilities and equipment"). And the language of § 252(e)(6) focuses the court's review on the agreement itself. *See Indiana Bell Tel. Co. v. McCarty,* 30 F.Supp.2d 1100, 1103 (S.D.Ind.1998) ("Jurisdiction exists under the Act only if the following three prerequisites are satisfied: (1) the claim regards a State commission determination; (2) the claimant is an aggrieved party; and (3) the claimant seeks review of whether a statement or an agreement between an interconnecting service provider and a local

---

5. The parties are in agreement that the Board is a "State commission" for purposes of the Act.

6. This conclusion means that the Act does not close the Puerto Rico courts to PRTC, since

§ 252(e)(4) bars state court review only of "the action of a State commission in approving or rejecting an agreement." 47 U.S.C. § 252(e)(4).

exchange carrier satisfies the requirements of sections 251 and 252."); *GTE Florida Inc. v. Johnson,* 964 F.Supp. 333, 335 (N.D.Fla.1997) ("[Section 252(e)(6) ] of the Act ... makes clear that this court has jurisdiction only 'to determine whether the agreement or statement meets the requirements of' the Act."); *GTE South Inc. v. Morrison,* 957 F.Supp. 800, 804 (E.D.Va. 1997); *Citizens' Utility Ratepayer Bd. v. McKee,* 946 F.Supp. 893, 895 (D.Kan.1996) (stating that federal court jurisdiction under § 252(e)(6) is "not without limits" and that "the court may hear ... only those actions in which an aggrieved party seeks a determination of whether the agreement between the interconnecting service provider and the local exchange carrier satisfies the requirements of sections 251 and 252").

Indeed, the courts that have thus far extended § 252(e)(6) review to post-approval/rejection determinations have done so in circumstances, such as a state commission's interpretation of a term in the agreement, in which the commission's determination was closely tied to the agreement itself.[7] *See, e.g., Illinois Bell Tel. Co.,* 179 F.3d at 571–72 (deciding whether a state commission's interpretation of the reciprocal compensation provisions of an interconnection agreement regarding calls to Internet service providers violated federal law); *Taylor Communications Group, Inc. v. Southwestern Bell Tel. Co.,* 172 F.3d 385, 388 (5th Cir.1999) (assuming without any mention of the issue that federal court has subject matter jurisdiction over an action challenging a state commission's interpretation of the reciprocal compensation provisions of an existing interconnection agreement); *cf. Wisconsin Bell, Inc. v. TCG Milwaukee, Inc.,* 27 F.Supp.2d 1145, 1146–48 (W.D.Wis.1998)

(leaving open the question of whether the court has jurisdiction over a state commission decision interpreting the phrase "local traffic" in an existing interconnection agreement to include calls to Internet service providers).

■ The pertinent question here is whether the Board determination as to which PRTC is aggrieved has a sufficient nexus to the interconnection agreement between PRTC and CCPR to fall within the broad interpretation of § 252(e)(6) for which PRTC argues. Because the parties use the terms "interpretation" and "enforcement" almost exclusively, we review whether the Board's order can be placed in either of these two categories, although those terms are not talismanic and cannot be found anywhere relevant in § 252 itself. The order does not fit in either category.

First, the relevant portion of the Board's order does not interpret the agreement. This point is slightly obscured by the fact that the state commission order issued to resolve a proceeding in which CCPR argued that PRTC's actions had violated the interconnection agreement. This proceeding may well have been, as PRTC alleges, focused on the agreement and how it should be interpreted. Indeed, the Board's December 1997 order actually does interpret the interconnection agreement. But this is not the portion of the Board's order as to which PRTC is "aggrieved," *see* 47 U.S.C. § 252(e)(6), and it is not the portion that PRTC challenges. PRTC won before the Board on the issue of the interconnection agreement's meaning, and would surely like that aspect of the order to stand. What PRTC is "aggrieved" about is the Board's application of Puerto Rico law to relieve PRTC's customers of any duty to pay what the Board characterized as retroactive or surprise

---

7. Further, the Act recognizes that there are various types of commission determinations that are not related to interconnection agreements but nevertheless should be subject to a form of federal review under certain conditions. This recognition is embodied in § 253, with its broad preemption of laws that inhibit

competition and its authorization for the FCC to take action where this principle has been violated. *See* 47 U.S.C. § 253(a), (c); FCC Suggested Guidelines for Petitions for Ruling Under Section 253 of the Communications Act, FCC 98–295, 1998 WL 795231 (Nov. 17, 1998).

charges. This application is not in any sense an interpretation of the agreement; the agreement only defines the relationship between CCPR and PRTC, and does not address the relationship between PRTC and its customers or the issue of notice.

Nor, although the question is a closer one, is the Board's order sufficiently connected to the interconnection agreement to be considered a refusal to enforce that agreement. The agreement itself was upheld (in the portion of the Board's order that PRTC does not contest), but it could not be carried out in just the way that PRTC wanted to carry it out because of the operation of separate principles of law. These principles, defining the content of "good faith" under Article 1210 of the Puerto Rico Civil Code, are concerned with the rights of telephone company customers vis-à-vis the carriers. The agreement simply did not give PRTC the right to refuse to comply with otherwise applicable law.[8] Cf. *Michigan Bell Tel. Co. v. Strand,* 26 F.Supp.2d 993, 1000 (W.D.Mich.1998) (dismissing for failure to state a claim plaintiff's assertion that a state commission order issued after the approval of an interconnection agreement had the effect of replacing the existing agreement with something new, since the state commission's action was permissible state regulation under § 261(c)).

■ It is not enough to establish a nexus that the order adversely affects a carrier. It is true that here the effect of the Board's order is that PRTC will not be able to collect any charges from its customers for certain calls made over a period of approximately four months. But that effect does not make the Board's decision a decision about the agreement. The fact that the particular charges as to which PRTC failed to give notice were specified in an interconnection agreement is not

enough. PRTC's inability to collect the charges is due to its own choice about a matter not covered by the agreement—the manner of collecting the charges—and not to any inconsistency between the agreement itself (which is not inherently infirm) and Puerto Rico law.

It may also be true that the Board's order had some effect on competition in the Puerto Rico market. The parties argue about whether PRTC's initial actions were anticompetitive, intended to give an advantage to its own affiliated cellular phone company over CCPR, and whether the Board's order in effect gave CCPR a better deal than it had bargained for. The provisions of § 253 constitute at least an implicit recognition that state commission decisions made outside the § 252 context can have such an impact. If a state commission determination "prohibit[s] or [has] the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service," the aggrieved party can petition the FCC to preempt it. 47 U.S.C. § 253(a), (d). But the mere fact that the Board's order, which obviously did not amount to such a prohibition, impacted the market in some way does not demonstrate an adequate nexus with the interconnection agreement.

■ PRTC argues that the Board's order is nonetheless a "determination under" § 252 in that the Board's application of Puerto Rico law fits under § 252(e)(3), which states that "nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law *in its review of an agreement* " (emphasis added). But the relevant portion of the Board's order was not the "review of an agreement."

The Board's actions fit much more naturally under § 253(b), which provides that the Act's preemption provision shall not "affect the ability of a State to impose, on

---

8. Whether the Board's decision was right or wrong on state law grounds, and whether PRTC had any knowledge of a notice requirement at the time it decided to begin collecting

the charges, are disputes that do not illuminate the question of the relationship between the Board's decision and the interconnection agreement.

a competitively neutral basis and consistent with section 254 of this section [which deals with 'universal service'], requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers." To the extent that the relevant portion of the order can be considered a determination under any section of the Act, § 253, with its specific reference to consumer protection, applies better than § 252.[9]

The Board's order was not, in conclusion, a "determination" under § 252, because it was insufficiently linked to the parties' interconnection agreement. Although the order may have affected the parties' agreement in a secondary way, Congress—although it could have spoken more broadly, *cf., e.g.*, 28 U.S.C. § 1338 (conferring on the federal courts exclusive jurisdiction over any action arising under a federal statute "relating to" patents and copyrights)—did not choose to grant the federal courts jurisdiction over any state commission determination that merely relates to or has some effect on an interconnection agreement or on competition between the players in a local telecommunications market. Our resolution avoids federal judicial review of a range of state commission determinations. Given the proliferation of interconnection agreements, *see* Endejan, *Cable's "Other Hat"—Providing Telecommunications Services*, 551 PLI/Pat 291, 296 (Mar.-Apr. 1999) (stating that about 2400 interconnection agreements had been reached by the Act's second anniversary), it is easy to predict that an agreement will often be in the background and be potentially affected in some way by state commission

rulings, including consumer protection rulings such as the one in this case.

*b. "[R]equirements of section 251 of this title and [section 252]"*

Even were we wrong and the Board's order could be considered a "determination" under § 252, we would still affirm the district court's dismissal because the claims are outside of the limited scope of review federal courts are afforded by § 252(e)(6).

Different parties have staked out different positions on the scope of that review. PRTC says that review of all state law issues involved in Board action is available. CCPR and MCI say that whether there is federal jurisdiction does not necessarily depend on whether the state commission decision is based on state or federal law. The district court was apparently of the view that no review is ever available in federal court of any application of state law by the state commission. The views of PRTC and of the district court are in error, and we elaborate on why we have chosen a middle ground instead and why nonetheless the claims here are not subject to federal judicial review.

■ Section 252(e)(6) does not confer authority on federal courts to review the actions of state commissions for compliance with state law. In this we agree with the conclusion of the Seventh Circuit. *See Illinois Bell Tel. Co.*, 179 F.3d at 572;[10] *see also MCI Telecomms. Corp. v. Illinois Commerce Comm'n*, 183 F.3d 558, 563–64 (7th Cir.1999), *reh'g granted on other grounds*, 183 F.3d 567 (7th Cir.1999); *cf., e.g., U.S. West Communications, Inc. v. AT & T Communications of the Pacific*

---

**9.** We do not decide whether the Board's actions were in fact "necessary" or "competitively neutral."

**10.** The Seventh Circuit arguably characterized this question as a scope of review question rather than a jurisdictional question, *see Illinois Bell Tel. Co.*, 179 F.3d at 571–72, but

since the standard of review in this case is the same for failure to state a claim and for lack of jurisdiction, for present purposes this is a distinction without a difference, and we need not decide whether our determination here is best characterized as a jurisdictional one.

*Northwest, Inc.,* 31 F.Supp.2d 839, 843–44 (D.Or.1998).

PRTC argues that since § 252(e)(3) preserves states commissions' authority to apply state law when "review[ing]" an agreement, application of correct state law must be considered one of the "requirements" of § 252, and federal courts therefore can review a state commission's determination for compliance with state law even if that determination is totally consistent with the substantive and procedural requirements of federal law. *See* 47 U.S.C. § 252(e)(3), (e)(6).

This argument fails. First, it is an untenable linguistic leap to construe a preservation of state authority, an explicit acknowledgment that there is room in the statutory scheme for autonomous state commission action, as constructing some kind of "requirement." Further, the structure of and the use of similar phrases in the relevant provisions argue against PRTC's position. For instance, in § 251(d)(3), a provision analogous to § 252(e)(3), Congress stated that "the Commission shall not preclude the enforcement of any . . . order.. of a State commission that . . . is consistent with the requirements of this section" and "does not substantially prevent implementation of the requirements of this section." *Id.* § 251(d)(3). The use of "requirements of this section" here illustrates that the phrase is intended to refer to something outside state law, something that state law can be compared to—namely, the requirements of the federal law. Also, PRTC's view that § 252(e)(3) requires consistency with existing state law, which PRTC roots in assumptions about congressional intent, is a gloss not found anywhere in the statute.

Indeed, it is the very existence of the savings clause in § 252 that makes the last phrase in § 252(e)(6) necessary and meaningful. As the Seventh Circuit explained: "Because subsections 252(e)(3) and (f)(2) allow a state commission to consider state law when approving an agreement, we think it clear that subsection 252(e)(6) includes the 'agreement' language[, 'to determine whether the agreement . . . meets the requirements of section 251 of this title and this section,'] . . . to clarify that federal courts may review a state commission's actions with respect to an agreement only for compliance with the requirements of § 251 and § 252 of the Telecommunications Act, and not for compliance with state law." *MCI Telecomms. Corp.,* 183 F.3d at 564. If Congress intended federal courts' review to encompass any kind of alleged legal flaw in a state commission's determination, then there would have been little need to include the language "meets the requirements of section 251 . . . and [section 252]." *See generally Ratzlaf v. United States,* 510 U.S. 135, 140–41, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) (citing *Pennsylvania Dep't of Public Welfare v. Davenport,* 495 U.S. 552, 562, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990)).

Second, our interpretation is in keeping with the general policy expressed in the statute of recognizing state authority over certain aspects of local telecommunications—in areas over which the states held virtually exclusive sway prior to the enactment of the Act—while ensuring compliance with federal law. The Act exemplifies a cooperative federalism system, in which state commissions can exercise their expertise about the needs of the local market and local consumers, but are guided by the provisions of the Act and by the concomitant FCC regulations, *see AT & T Corp.,* 525 U.S. 366, 119 S.Ct. at 733 ("While it is true that the 1996 Act entrusts state commissions with the job of approving interconnection agreements, . . . these assignments . . . do not logically preclude the Commission's issuance of rules to guide the state-commission judgments."), and checked by federal court review for consistency with these federal provisions. *See generally City of Abilene v. FCC,* 164 F.3d 49, 53 (D.C.Cir.1999) (stating that § 253(b) and (c) "set aside a large regulatory territory for State authority"); H.R. Conf. Rep. No. 104–458, at 126 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124, 137

("Agreements arrived at through voluntary negotiation or compulsory arbitration must be approved by the State commission under new section 252(e), which ... preserves State authority to enforce State law requirements in agreements approved under this section."). It would be "surpassing strange" to preserve state authority in this fashion and then to put federal courts in the position of overruling a state agency on a pure issue of state law. *AT & T Corp.*, 525 U.S. 366 n. 6, 119 S.Ct. at 730 n. 6. *See generally Aegerter v. City of Delafield,* 174 F.3d 886, 887 (7th Cir.1999) ("The Telecommunications Act of 1996 was nothing if not a complex balancing act among many conflicting interests. Not the least of these were the interests of state and local governments in continuing to regulate certain aspects of this industry, and the need for a uniform federal policy."); *Town of Amherst v. Omnipoint Communications Enters., Inc.,* 173 F.3d 9, 17 (1st Cir.1999); Rosario & Kohler, *The Telecommunications Act of 1996: A State Perspective,* 29 Conn. L.Rev. 331, 332 (1996) (suggesting that in the wake of the Act "states should be afforded flexibility to craft regulation to the needs of their local markets" and that states should focus on "consumer protection").

It is true, as PRTC points out, that this interpretation of § 252(e)(6) creates a possible gap in review for a narrow class of cases. But this case is not among them. This possibility exists because § 252(e)(4) states that "[n]o State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section." Therefore, PRTC argues, our interpretation means that there will be no judicial review in cases involving acceptance or rejection of an interconnection agreement in which the only issue raised is compliance with state law. We do not purport to interpret § 252(e)(4); this case clearly does not involve an acceptance or a rejection.[11]

■ The district court applied a version of this schema, but went too far in disallowing review of state commission "determination[s]" that are based on state rather than federal law. *See Puerto Rico Tel. Co.,* 20 F.Supp.2d at 311 (stating that "[t]his court has subject matter jurisdiction under the Act only when a state regulator applies federal law in its acceptance or rejection of an interconnection agreement"). It is perfectly conceivable that a state commission decision based on state law about an interconnection agreement could come in conflict with or violate some provision of § 251 or § 252. Such a decision would be reviewable, although a decision based on state law that is consistent with federal law but arguably wrong on state law grounds would not be. *See Michigan Bell Tel. Co. v. MFS Intelenet of Michigan, Inc.,* 16 F.Supp.2d 817, 824 & n. 6 (W.D.Mich.1998).

PRTC's argument has not been so subtle; it contends that § 252(e)(6) applies here because the Board acted in violation of state law and therefore automatically violated § 252. Although PRTC's complaint alleges generally that the Board's decision was in violation of federal law,[12] PRTC cannot rest on such vague generalities here, but must identify the portions of the Act that it claims are at issue and give some reasoned explanation in support of its contentions. *See generally McCoy v. MIT,* 950 F.2d 13, 22–23 (1st Cir.1991) (stating in a motion to dismiss context that "the plaintiff has an affirmative responsibility to put his best foot forward in an effort to present some legal theory that will support his claim").

11. There may arguably be some distinction between the "action" covered by § 252(e)(4) and the "determination" covered by § 252(e)(6), but this is not an argument that we enter into.

12. The allegations that are not specifically tied to rejection of the agreement state that the Board's order "violates the Communications Act because it is grossly inequitable to PRTC, is without reasoned basis, and requires PRTC to provide services without any compensation therefor," and that the order violates "federal law because it does not result in just and reasonable rates."

■ The only "requirement" of § 251 or § 252 that PRTC identifies in its argument to this court is § 252(h), which provides that "[a] State commission shall make a copy of each agreement approved under subsection (e) of this section ... available for public inspection and copying within 10 days after the agreement ... is approved." 47 U.S.C. § 252(h).[13] This assertion of inconsistency with federal law is plainly unsupported on the face of plaintiff's own complaint. The Board's order approving the interconnection agreement says that, pursuant to § 252(h), a copy of the agreement will be made available. PRTC does not allege that this was not done. What PRTC appears to be arguing is that the availability of the interconnection agreement to the public under § 252(h) means that the public had sufficient notice of the charges and that the Board's order requiring prior notice to customers before imposition of the charges was therefore erroneous. But § 252(h) does not prevent and is not inconsistent with a more stringent state-law-based actual notice requirement. *Cf. In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 FCC Rcd. 15499, 1996 WL 452885, at *18 (1996) (First Report & Order) ("The rules that the FCC establishes ... are minimum requirements upon which the states may build.").

## B. Takings and Due Process Claims

In its takings claim, PRTC has to establish two propositions: that a protectable property interest is involved and that the government action is a taking without just compensation. It fails at both.

■ The Takings Clause of the Fifth Amendment, which is applicable to the states through the Fourteenth Amendment, provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V; *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980). A plaintiff "must first establish an independent property right before [it] can argue that the state has taken that right without just compensation." *Parella v. Retirement Bd. of the Rhode Island Employees' Retirement Sys.*, 173 F.3d 46, 58 (1st Cir.1999). An enforceable contract right can in some circumstances provide the necessary property right. *See id.* at 58–59; *see also National Educ. Ass'n–Rhode Island v. Retirement Bd. of the Rhode Island Employees' Retirement Sys.*, 172 F.3d 22, 29 (1st Cir. 1999) (noting that in the takings context the property concept has been extended to "materialmen's liens" and "trade secrets protected under state law" but not to "unilateral expectation[s]" such as "riparian rights recognized under state law, railroad pensions, and future social service benefits").

■ Second, once a property right has been established, courts analyze whether the state has effected a regulatory taking by considering "the character of the gov-

---

**13.** The district court stated that "PRTC does not allege that the Board interpreted the Agreement in contravention of federal law, but argues that the Board essentially rejected the Agreement in its December 24 Order." *Puerto Rico Tel. Co.*, 20 F.Supp.2d at 311. Amicus MCI Worldcom, Inc. characterizes this statement as too constricted a reading of the complaint and argues that, liberally construed, PRTC's complaint states a claim that the Board's state law determination violates requirements in § 251 and § 252 that the rates, terms, and conditions established under the agreement be just and reasonable. PRTC itself, however, does not make the argument (except perhaps in the most skeletal manner by citing its complaint), and therefore we do not consider it. *See United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 6 (1st Cir.1996) ("While amicus briefs are helpful in assessing litigants' positions, an amicus cannot introduce a new argument into a case."); *McCoy*, 950 F.2d at 22–23. In any event, it is not apparent to us, without explanation, how on the facts alleged the Board's order can be considered to have violated the Act's provisions dealing with justness and reasonableness.

ernment action, its economic impact on the plaintiff, and the degree to which it interferes with the plaintiff's reasonable, investment-backed expectations." *Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 190 (1st Cir.1999); *see also National Educ. Ass'n*, 172 F.3d at 30 n. 11 (noting that "investment-backed expectations" are used to decide the takings question "after a property right is found to exist"); *Peterson v. United States Dep't of the Interior*, 899 F.2d 799, 813 (9th Cir. 1990) (stating that a constitutionally protected property interest cannot be "spun out of the yarn of investment-backed expectations"). A monopoly operating in a highly regulated industry should expect that its business will frequently be affected by government action. *See Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 227, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986); *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 679 (1st Cir.1998); *McAndrews v. Fleet Bank of Mass., N.A.*, 989 F.2d 13, 19 (1st Cir.1993).

■ As to the first prong, PRTC does not argue that the Board's ruling constitutes a taking of tangible property. Rather, it argues that it has a property interest in the contractual right established in paragraph IV of the interconnection agreement, in which CCPR agreed that PRTC could charge PRTC customers long-distance charges for certain calls. Assuming that a contract between two private entities that has been approved by a state agency can create the necessary property right, PRTC's argument nevertheless fails.

■ "The critical and threshold question is whether appellant's interest ... is grounded in substantive legal relationships defined by ... specific state or federal rules of law." *Davila–Lopes v. Zapata*, 111 F.3d 192, 195 (1st Cir.1997) (internal quotation marks omitted); *see also Lowe v.*

*Scott*, 959 F.2d 323, 337 (1st Cir.1992) ("The hallmark of property, the Court has emphasized, is an individual entitlement grounded in state law, which cannot be removed except for cause." (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982)) (internal quotation marks omitted)). PRTC's argument does not address the relevant "legal relationship": although the interconnection agreement may give PRTC rights vis-à-vis CCPR, it cannot grant PRTC the underlying ability to charge, without prior notice, its landline customers, who were not parties to the agreement, for the relevant calls. The Board's action did not take away rights that PRTC had against CCPR; the Board dealt only with the manner in which PRTC undertook to impose the charges discussed in the agreement. Without establishing some separate agreement with the customers, enforceable under Puerto Rico law, or some independent provision of that law entitling it to the particular charges at issue, PRTC has not shown that its interest in those charges was more than a "unilateral expectation." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) ("Property interests ... are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state-law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."), *cited in Washington Legal Found. v. Massachusetts Bar Found.*, 993 F.2d 962, 973 (1st Cir.1993); *cf. National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 470–71, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985); *TCG Milwaukee, Inc. v. Public Serv. Comm'n of Wisconsin*, 980 F.Supp. 992, 1002 (W.D.Wis.1997).[14]

14. In its reply brief, PRTC raises clearly for the first time the argument that the "century old filed-rate doctrine ... establishes a property interest under both the Takings and Due process Clauses of the Fifth Amendment."

Since this argument was not articulated in PRTC's initial brief (despite the fact that one of the district court's grounds for dismissal of the takings claim was the lack of a property interest) or presented to the district court in

■ PRTC also does not meet the second prong. Accepting that the failure to collect the charges will undoubtedly have some economic impact on PRTC, it is still true that the Board's action is a "public program that adjusts the benefits and burdens of economic life to promote the common good" in a highly regulated context. *McAndrews*, 989 F.2d at 19 (citation and internal quotation marks omitted); *see also Eastern Enters. v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 2149, 141 L.Ed.2d 451 (1998) (plurality opinion) ("Congress has considerable leeway to fashion economic legislation, including the power to affect contractual commitments between private parties. Congress also may impose retroactive liability to some degree ...."); *cf. Houlton*, 175 F.3d at 191 (discussing analogous Contract Clause claim).

■ Similar defects lead us to affirm the district court's dismissal of PRTC's procedural due process claim. "An expectation that is not 'property' for purposes of the Takings Clause may yet sometimes entitle the citizen to procedural protection, and substantive protection against arbitrariness, before the expectation is cut off by government action." *National Educ. Ass'n*, 172 F.3d at 29–30; *see also, e.g., Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978) ("The Fourteenth Amendment places procedural constraints on the actions of government that work a deprivation of interests enjoying the stature of 'property' within the meaning of the Due Process Clause."). However, PRTC essentially relies on its Takings Clause arguments to demonstrate the existence of a property right subject to constitutional procedural protections. Because in this case plaintiff's claims of a protected property interest under both the Takings Clause and the Due Process Clause depend on the existence of a particular kind of contractual right under the interconnection agreement, the determination that such a right does not exist resolves both claims. *See Rhode Island Laborers' Dist. Council v. Rhode Island*, 145 F.3d 42, 44 n. 1 (1st Cir.1998); *see also Roth*, 408 U.S. at 577, 92 S.Ct. 2701.

■ Further, even assuming the existence of a protectable property right for due process purposes, PRTC cannot show on the facts alleged that it did not receive the process it was due. *See generally Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The undisputed facts show that the Board held two days of trial-type hearings during which PRTC had the opportunity to present evidence and to challenge CCPR's evidence before a neutral decisionmaker, and that the Board ultimately rendered its ruling and gave supporting reasons in a written decision. PRTC knew that these hearings involved its right to impose the long-distance charges on its customers, and, as the exhibits to PRTC's complaint demonstrate, PRTC was also aware that the Board was concerned with the issue of notice to those customers.[15]

PRTC's briefs in response to defendants' motions to dismiss the takings and due process claims, it is doubly waived, *see, e.g., Sammartano v. Palmas Del Mar Properties, Inc.*, 161 F.3d 96, 97–99 (1st Cir.1998); *United States v. Brennan*, 994 F.2d 918, 922 n. 7 (1st Cir. 1993) (noting the "well settled" rule that legal arguments made for the first time in an appellant's reply brief are tardy), and PRTC has provided us with no reason to exercise our discretion to relax the waiver rule in this case.

15. For instance, the Hearing Examiner's recommended decision, which recounts some of the testimony presented, states that the following occurred when a PRTC witness was questioned by a member of the Board:

> Attorney Reyes answered that PRTC's customers were not part of the Interconnection Agreement executed between the parties on September 2, 1997, and did not participate in the negotiations regarding said agreement. When asked if PRTC had informed its customers of the Interconnection Agreement, Attorney Reyes answered that Tariff K–1, which was approved in 1987 through public hearings, contains the terms and conditions by which calls originating or terminating in PRTC's network between mobile and wireless carriers go through....

■ In the end, PRTC appears to be primarily contending not that it was ignorant that consumer protection issues were potentially of concern to the Board, but that it was not afforded adequate notice of the particular adjudicatory holding that the Board ultimately adopted. While PRTC's complaint is real, and we have some sympathy, *constitutionally adequate* notice does not necessarily involve notice of a particular outcome. Notice is sufficient as long as it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *see also Dionne v. Bouley*, 757 F.2d 1344, 1354 (1st Cir.1985), and "the affected individual has had a fundamentally fair chance to present his or her side of the story," *In re Nineteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 982 F.2d 603, 611 (1st Cir.1992); *see also Mathews*, 424 U.S. at 333, 96 S.Ct. 893 (requiring "the opportunity to be heard 'at a meaningful time and in a meaningful manner'" (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965))).

Further, if PRTC did not have notice of a contemplated thirty-day requirement before the Board's proceedings commenced, PRTC still had some chance to challenge that requirement, which did not involve charges for future calls. Once PRTC was informed of the specific outcome (which was suggested in the Hearing Examiner's recommendations to the Board and then adopted by the Board itself), it had the opportunity to challenge the Board's interpretation of Puerto Rico law through a request to the Board for a stay and for reconsideration and through an action in the Puerto Rico courts. *Cf. Rumford Pharmacy, Inc. v. City of East Providence*, 970 F.2d 996, 999 (1st Cir.1992);

*Amsden v. Moran*, 904 F.2d 748, 755 (1st Cir.1990).

Both the takings and due process inquiries are typically fact and context-sensitive ones. On the theory it has properly presented here, PRTC has not adequately established the existence of a property right or alleged other facts sufficient to support either type of claim. *See, e.g., Tri–State Rubbish, Inc. v. Waste Management, Inc.*, 998 F.2d 1073, 1082 (1st Cir. 1993) (affirming grant of motion to dismiss takings claim); *Quinn v. Bryson*, 739 F.2d 8, 10–11 (1st Cir.1984) (affirming grant of motion to dismiss procedural due process claim).

### III

"It would be gross understatement to say that the Telecommunications Act of 1996 is not a model of clarity." *AT & T Corp.*, 525 U.S. at ——, 119 S.Ct. at 738. Nevertheless, in this case the Act does not confer on the federal courts the authority to review PRTC's telecommunications claims. PRTC's takings and due process claims likewise fail, and the district court was not outside the bounds of its discretion in dismissing the action, thereby declining to retain supplemental jurisdiction over PRTC's state law claims. *See* 28 U.S.C. § 1367(c); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). To the extent that other fora, such as the courts of Puerto Rico and the FCC, are open to PRTC (a question that we do not purport to decide), PRTC can pursue an action in those fora.

The judgment of the district court is *affirmed.* Costs to appellees.

---

Asked how customers would know that a call from their station to a mobile station was a long distance call, she stated that the

definition of long distance call contained in PRTC Tariff Regulations should be harmonized with Tariff K–1 . . . .