[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 10, 2002
THOMAS K. KAHN
CLERK

No. 00-12809

D. C. Docket No. 99-00248-CV-JOF-1

BELLSOUTH TELECOMMUNICATIONS, INC.,

Plaintiff-Counter-Defendant-
Appellant-Cross-Appellee,

UNITED STATES OF AMERICA,

Intervenor-Appellant,

versus

MCIMETRO ACCESS TRANSMISSION SERVICES, INC.,

Defendant-Counter-
Claimant-Appellee,

GEORGIA PUBLIC SERVICE COMMISSION,
ROBERT B. BAKER, JR., in his
official capacity as Chairman,
LAUREN "BUBBA" MCDONALD, in his
official capacity as Commissioner,
ROBERT DURDEN, in his official
capacity as Commissioner,
STANCIL O. WISE, in his official
capacity as Commissioner,

Defendants-Appellees-
Cross-Appellants.

_____

No. 00-12810

_____

D. C. Docket No. 99-00249 CV-JOF-1

BELLSOUTH TELECOMMUNICATIONS, INC.,

Plaintiff-Counter-Defendant-
Appellant-Cross-Appellee,

UNITED STATES OF AMERICA,

Intervenor-Appellant,

versus

WORLDCOM TECHNOLOGIES, INC.,
a successor in interest to MFS
INTELENET OF GEORGIA, INC.,

Defendant-Counter-
Claimant-Appellee,

E.SPIRE COMMUNICATIONS, INC.,
formerly known as American
Communications Services, Inc.,
NEXTLINK GEORGIA, INC.,
TELEPORT COMMUNICATIONS
ATLANTA, INC.,

Defendants-Appellees,

2

GEORGIA PUBLIC SERVICE COMMISSION,
ROBERT B. BAKER, JR., in his
official capacity as Chairman,
LAUREN "BUBBA" MCDONALD, in his
official capacity as Commissioner,
ROBERT DURDEN, in his official
capacity as Commissioner,
STANCIL O. WISE, in his official
capacity as Commissioner,

                                    Defendants-Appellees-
                                    Cross-Appellants,

ICG TELECOM GROUP, INC.,

                                    Defendant.

---

Appeals from the United States District Court
for the Northern District of Georgia

---

**(January 10, 2002)**

Before TJOFLAT, BARKETT and POLITZ*, Circuit Judges,

---

*Honorable Henry A. Politz, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

TJOFLAT, Circuit Judge:

In these consolidated appeals, we are asked to review two orders of the Georgia State Public Commission (the "GPSC"), which interpreted contracts between telecommunications carriers. The contracts were interconnection agreements mandated by the federal Telecommunications Act of 1996, 110 Stat. 56, 56 (1996). The United States District Court for the Northern District of Georgia, believing that the GPSC had the authority to interpret these agreements under that statute, affirmed the orders. We find no statutory authority for the action that the GPSC took in these cases and therefore reverse.

I.

A.

When telephone companies became part of the American scene in the early part of the twentieth century, local telephone companies competed with one another for customers. See H.R. Rep. No. 101-204, at 50 (1996), reprinted in 1996 U.S.C.C.A.N. 10, 13. Competing telephone companies did not interconnect their systems; in order for a customer of one company to call a customer of another

4

company, he had to subscribe to the other company. Customers found this scenario unsatisfactory, and eventually a company emerged in each locality that provided all of the local service. Id. Thus, when Congress passed the first major telecommunications law, the Communications Act of 1934, local telephone service was a "natural monopoly." AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 371, 119 S. Ct. 721, 726, 142 L. Ed. 2d 835 (1999); Stephen Breyer, Regulation and Its Reform 291 (1982).

A natural monopoly exists, "[i]f the entire demand within a relevant market can be satisfied at lowest cost by one firm rather than by two or more." Richard A. Posner, Natural Monopoly and Its Regulation, 21 Stan. L. Rev. 548, 548 (1969). The notion that local telephone service was a natural monopoly was driven in large part by technology: In 1934, local telephone service required local exchanges and loops consisting of cables under the ground or wires strung on telephone poles, and competition would have required the inconvenience and duplication involved in having several exchanges and numerous extra sets of wires and poles. Breyer at 291-92. In the Communications Act of 1934, Congress did not try to break up the monopolies this technology created, but rather tried to harness it through regulation. As one leading treatise put it, "[t]he 1934 Communications Act presumed that [the] end-to-end monopoly would be shadowed by end-to-end

5

regulation." Peter W. Huber, Michael K. Kellogg & John Thorne, <u>Federal Telecommunications Law</u> § 2.1.3 (2d ed. 1999). The regulation would be provided by the Federal Communications Commission (the "FCC").

The Communications Act gave the FCC the responsibility of regulating interstate and foreign commerce in wire and radio communication. Communications Act of 1934 §§ 1, 4-5, 47 U.S.C. §§ 151, 154-55 (1991). The Act did not grant the FCC jurisdiction to regulate local telephone service, however. Instead, the Act expressly provided that local telephone service would fall under the exclusive jurisdiction of state commissions. Communications Act of 1934, ch. 652, § 221(b), 48 Stat. 1064, 1080, <u>repealed by</u> Telecommunications Act of 1996, Title VI, § 601(b)(2), Pub. L. No. 104-104, 110 Stat. 56, 143.[1] Free from federal regulation, "[s]tates typically granted an exclusive franchise in each local service area to a local exchange carrier (LEC), which owned, among other things, the local loops (wires connecting telephones to switches), the switches (equipment directing calls to their destinations), and the transport trunks (wires carrying calls between

---

[1] According to the words of the 1934 Act,
Nothing in this Act shall be construed to apply, or to give the Commission jurisdiction, with respect to charges, classifications, practices, services, facilities, or regulations for or in connection with wire telephone exchange service, even though a portion of such exchange service constitutes interstate or foreign communication, in any case where such matters are subject to regulation by a State commission or by local governmental authority.

switches) that constitute a local exchange network." AT&T Corp., 525 U.S. at 371, 119 S. Ct. at 726, 142 L. Ed. 2d 835.

B.

As time passed, the paradigmatic underpinnings of this regulatory structure began to crumble. Technological developments, like optic fiber transmission and mobile telephones, created the possibility that local telephone service might be provided without switches or loops. Breyer at 292; Huber et al. § 2.1.2.[2] Perhaps more importantly, policymakers increasingly saw market competition as a more efficient method of providing public services than state regulation and sought deregulation of these services in conjunction with this mindset. See e.g., Huber et al. § 2.1.2 ("Policy makers have also come to recognize that even if markets are less than perfectly competitive, regulation is often ineffectual or worse because of inadequate information about the true costs of efficient production."). Congress

---

[2] In 1982, Stephen Breyer, now an Associate Justice of the United States Supreme Court, expressed doubt that new technologies alone would spell the end of local telephone service monopolies: "While it has been argued that technological developments such as optic fiber transmission or mobile land telephone service may make competition possible in the future, or may allow firms to bypass local exchanges when they offer long-distance service, these developments seem speculative enough that new firms have not asked to enter the local business." Breyer at 292.

7

consequently enacted the Federal Telecommunications Act of 1996 (the "Act") "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, 56 (1996).

To effectuate its goal of promoting competition in local telephone service, Congress needed to do more than simply remove all regulatory barriers to market entry. After all, local telephone service, as mentioned, is a natural monopoly. Congress, therefore, had to take affirmative steps within the 1996 Act to counteract those unique elements of telephony that deter competition, specifically the high, fixed initial cost and the need for all customers to interconnect with one another. Its solution was the establishment of a complex regulatory regime in which incumbent LECs ("ILECs") would share access to loops and exchanges with competing LECs ("CLECs").

The centerpieces of this regime are sections 251 and 252 of the Act, codified at 47 U.S.C. §§ 251-252. Section 251 imposes various duties on all LECs, including the duty not to prohibit the resale of its telecommunication services; the duty to provide number portability; the duty to provide dialing parity to other LECs; the duty to afford other LECs access to poles, ducts, conduits, and rights-of-

way; and most significantly, the duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications. 47 U.S.C. § 251(b). Section 251 imposes additional obligation on ILECs. Specifically for the purpose of this case, an ILEC is required to interconnect its network with that of any requesting telecommunications carrier "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory." 47 U.S.C. §§ 251(c)(2).[3] ILECs also have a duty to negotiate in good faith the agreements establishing the rates, terms, and conditions of these interconnections. 47 U.S.C. § 251(c)(1).

The exact process for establishing these agreements is detailed in section 252 of the Act, now 47 U.S.C. § 252. Agreements can be formed in two different ways: voluntary negotiation or compulsory arbitration. After an ILEC receives a request from a CLEC for interconnection, the two parties may enter into a voluntary agreement to effectuate the transaction. 47 U.S.C. § 252(a)(1). If the parties so request, a mediator can be provided by the "State commission" to help

---

[3] Although not pertinent to this case, ILECs are also obligated "to provide . . . nondiscriminatory access to network elements on an unbundled basis at any technically feasible point on rates, terms, and conditions that are just, reasonable, and nondiscriminatory," 47 U.S.C. § 251(c)(3), and "to offer for resale at wholesale rates any telecommunications service that [they] provide[] at retail to subscribers who are not telecommunications carriers." 47 U.S.C. § 251(c)(4)(A).

negotiations. 47 U.S.C. § 252(a)(2).[4] During the period from the 135th to the 160th day after the ILEC receives the applicable request, either party may petition the State commission to arbitrate any open issues if an agreement cannot be reached voluntarily. 47 U.S.C. § 252 (b)(1). Upon hearing from both parties and requesting any further information it needs, the State commission will resolve any issue set forth in the petition and provide a schedule for implementation of its ruling. 47 U.S.C. § 252(c).

State commissions must base their rulings on standards prescribed in 47 U.S.C. § 252(d). Specifically, rates for interconnection or network elements must be nondiscriminatory and based on the cost of providing the interconnection, but may include a reasonable profit. 47 U.S.C. § 252(d)(1). Similarly, reciprocal compensation for the transport and termination of phone calls over the parties' networks must be set at rates that allow each party to recover its costs, including the additional cost of terminating such calls. 47 U.S.C. § 252(d)(2).

After an agreement between an ILEC and a CLEC is adopted by either negotiation or arbitration, the agreement must still be submitted to the State commission for approval, even if the agreement was a product of an arbitration

---

[4] Congress uses the words, "State commission," to refer to the commission created by the state, in which the LECs are located, to regulate telecommunications.

conducted by that same State commission. 47 U.S.C. § 252(e)(1). The standard of review for an agreement produced by arbitration is different from that for one reached through negotiation. An agreement adopted by arbitration will only be rejected if it conflicts with one of the statutory duties of LECs enumerated in section 251 of the 1996 Act or with a regulation prescribed by the FCC in accordance with the 1996 Act. 47 U.S.C. § 252(e)(2)(B). An agreement reached through negotiation can be rejected, however, if it discriminates against a third-party LEC or if it is not consistent with "the public interest, convenience, and necessity." 47 U.S.C. § 252(e)(2)(A).

The broadness of these parameters would seem to bestow tremendous leeway on state commissions when they review agreements made pursuant to section 252. Indeed, state commissions are free to establish and enforce state law requirements in their review of these federally mandated agreements. 47 U.S.C. § 252(e)(3). Nevertheless, the 1996 Act places several checks on the state commissions' authority. For instance, if a State commission fails to carry out its responsibilities under the Act, the FCC can preempt that commission's jurisdiction and resolve the matter itself. 47 U.S.C. § 252(e)(5). Furthermore, if the State commission does conduct a timely review of an agreement, the review is circumscribed by the dictates of the FCC, which, by the express terms of the

11

Communications Act of 1934, has the power to "prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of [either the 1934 Act or the 1996 Act]," including rules to guide state commissions in their judgments. 47 U.S.C. § 201(b); AT&T Corp., 525 U.S. at 377-86, 119 S. Ct. at 729-33, 142 L. Ed. 2d 835 (holding that the 1996 Act merely amended the 1934 Act, and thus the non-repealed sections of the 1934 Act -- in particular, 47 U.S.C. § 201(b) -- are applicable to the 1996 Act). Even after a state commission issues its ruling, accepting or rejecting an interconnection agreement, a party can still seek relief in a federal district court if it believes that the commission's order is inconsistent with sections 251 and 252 of the 1996 Act. 47 U.S.C. § 252(e)(6). In sum, the 1996 Act ensures that there is federal oversight over all of a State commission's actions with regard to the approval of an interconnection agreement.

Once a State commission approves an interconnection agreement, however, the 1996 Act does not obligate it to perform any further duties. The State commission has satisfied its duty to ensure that the interconnection agreement serves the public interest. Presumably, the approved interconnection agreement, which is then a binding contract between the parties, establishes the terms of their relationship.

C.

This case involves two interconnection agreements executed by BellSouth Telecommunications, Inc. ("BellSouth"). BellSouth executed the first agreement on August 30, 1996, with WorldCom Technologies, Inc. ("WorldCom").[5] The second agreement was executed on March 7, 1997, with MCImetro Access Transmission Services, Inc. ("MCImetro"). Pursuant to the 1996 Act, these agreements were submitted for approval or rejection to the State commission, in this case, the Georgia Public Service Commission (the "GPSC"), and were subsequently approved. Both agreements provide that the parties will receive reciprocal compensation for local traffic only.[6] According to the BellSouth-WorldCom Agreement, "'Local Traffic' refers to calls between two or more Telephone exchange service users where both Telephone Exchange Services bear NPA-NXX designations associated with the same local calling area of the

---

[5] WorldCom is the successor in interest to MFS Intelenet of Georgia, Inc ("MFS"). BellSouth actually executed the agreement with MFS. For convenience, we refer to MFS as WorldCom.

[6] See BellSouth-WorldCom Agreement § 5.8.1 ("Reciprocal Compensation applies for transport and termination of Local Traffic (including [ExtendedArea Service ("EAS")] and EAS-like traffic) billable by [BellSouth] or MFS which a Telephone Exchange Service Customer originates on [BellSouth]'s or MFS' network for termination on the other Party's network."); BellSouth-MCImetro Agreement § 2.2.1 ("The Parties shall bill each other reciprocal compensation at the rates set forth for Local Interconnection in this Agreement and the Order of the GPSC.").

13

incumbent LEC or other authorized area (e.g., Extended Area Service Zones in adjacent local calling areas)." The BellSouth-MCImetro Agreement similarly defines "local traffic" as "any telephone call that originates in one exchange and terminates in either the same exchange, or a corresponding Extended Area (EAS) exchange."

Under both agreements, compensation is provided when a party terminates the call made by another party's subscriber. For example, according to the BellSouth-WorldCom Agreement, if a WorldCom subscriber calls a BellSouth subscriber, the call terminates on BellSouth's network and WorldCom must pay BellSouth accordingly; likewise, BellSouth must compensate WorldCom every time that a BellSouth subscriber calls a WorldCom subscriber. The same principles hold true with regard to the BellSouth-MCImetro Agreement: BellSouth and MCImetro compensate each other when one of their subscribers calls a subscriber on the other's network.

The actual amount of compensation depends on the period of time that subscribers are on the phone, with rates being established on a per-minute basis. This type of arrangement can lead to discrepancies, if the subscribers of one LEC, e.g., BellSouth, call those of another LEC, e.g., WorldCom or MCImetro, for longer periods of time than the latter call the former. Such a situation developed

14

soon after the agreements were executed, when WorldCom and MCImetro began billing BellSouth for calls made by BellSouth customers to internet service providers ("ISPs") who were customers of WorldCom and MCImetro. Because people tend to spend long periods of time on the internet, these calls to ISPs often ran for long periods of time and represented financial boons to the CLECs that terminated them.

On August 12, 1997 BellSouth sent all CLECs with whom it had agreements, including both WorldCom and MCImetro, a letter informing them that it did not consider calls to Enhanced Service Providers (ESPs), including ISPs, to be local traffic and therefore would "neither pay, nor bill, local interconnection charges for traffic terminated to an ISP." In response, WorldCom and MCImetro filed separate complaints with the GPSC in late 1997, alleging that ISP-bound calls were local in nature and thus subject to reciprocal compensation under their respective agreements with BellSouth.[7]

On December 28, 1998, the GPSC disposed of the two complaints with separate orders, which are identical for present purposes. Noting in its order regarding the BellSouth-WorldCom Agreement that "a call to an ISP is placed

_____

[7] WorldCom filed its complaint on October 10, 1997; MCImetro filed its complaint on November 14, 1997.

15

using a local telephone number" and "[w]hatever services the ISP . . . provides are irrelevant to the fact that the call has terminated locally," the GPSC concluded that calls placed by Bell South users to ISPs who were customers of WorldCom were local calls and therefore subject to reciprocal compensation under the agreement.[8] The GPSC found similar facts applicable to the BellSouth-MCImetro Agreement:

> The evidence in this case shows that the ISP traffic consists of circuit-switched cells that terminate with the customer who happens to be an information service provider or Internet service provider. The manner in which BellSouth handles the calls, and the manner in which MCImetro handles the calls, is the same as the manner in which both companies handle local calls carried over their netwroks to any other customers who happened to be on the MCImetro network. The only distinction that can be drawn is that after the call is carried to the ISP, the ISP then provides access to the packet-switched Internet through the ISP's own local server. This is a distinction without a difference, so far as BellSouth and MCImetro are concerned as they carry the circuit-switched call to the ISP.

Not surprisingly, the GPSC reached the same conclusion, namely "that ISP traffic is local within the definition of the Interconnection Agreement, so both parties are contractually obligated to pay reciprocal compensation for ISP traffic."[9]

---

[8] In its order regarding the BellSouth-WorldCom Agreement, the GPSC actually upheld and affirmed a May 29, 1998 ruling by a Hearing Officer, for which the full commission granted review via an order on August 20, 1998.

[9] MCImetro's complaint about BellSouth's refusal to compensate MCImetro for calls made by BellSouth customers to MCImetro subscribers who are ESPs was one of ten counts submitted by MCImetro to the GPSC that attest that BellSouth violated the 1996 Act.

16

On January 27, 1999, BellSouth instituted the two actions in the district court that are now before us.[10]  Predicating the district court's jurisdiction on 47 U.S.C. § 252(e)(6) and 28 U.S.C. § 1331, BellSouth sought the following relief: (1) vacation of the GPSC's orders; (2) a declaratory judgment stating, among other things, that calls transmitted through an ISP over the Internet are interstate in nature and are not local traffic;[11] and (3) an order enjoining the GPSC and its commissioners from enforcing the orders.  Both WorldCom and MCImetro filed counterclaims in their respective cases seeking an order requiring BellSouth to comply with the GPSC's orders.

On May 3, 2000, the district court entered an order denying BellSouth relief and requiring it to pay reciprocal compensation for calls made to ISPs, as directed by the GPSC.[12]  Basing its jurisdiction on 47 U.S.C. § 252(e)(6), the court found

---

[10] The case involving the BellSouth-MCImetro Agreement is Case No. 1:99-CV-0248; the case involving the BellSouth-WorldCom Agreement is Case No. 1:99-CV-0249.

[11] BellSouth sought a declaration in its favor as to the following issues:
a) calls transmitted through an ISP over the Internet are interstate in nature and are not local traffic;
b) the terms of the Interconnection Agreement[s] between BellSouth and [the CLEC defendants] do not require BellSouth to pay reciprocal compensation for telecommunications traffic to an end user of [the CLEC defendants] that is also an ISP; and
c) the [G]PSC is without jurisdiction to convert interstate traffic, over which the FCC has exclusive jurisdiction, into local traffic.

[12] In addition to the cases currently before this court, the district court's order, which was handed down in both cases, also disposed of two disputes involving interconnection agreements

17

that the GPSC was not a necessary party "to determine whether the agreement . . . meets the requirements of" sections 251 and 252 of the 1996 Act. Nor did the court find that the GPSC was indispensable, as the court believed it could fashion appropriate relief without the GPSC by issuing a declaration or an injunction binding BellSouth and the CLEC defendants and the GPSC's interest in upholding its ruling would be well-represented by the CLEC defendants. Consequently, the court sua sponte dismissed the GPSC commissioners as defendants in the case.

Turning to the actual merits of the controversy, the district court, having decided that state commissions, like the GPSC, have authority under 47 U.S.C. § 252 to interpret interconnection agreements, found that the GPSC had not violated federal law by ruling that ISP-bound telephone calls were local traffic. The court also found that the GPSC ruling was consistent with the principles of Georgia contract law, under which the Agreements were explicitly governed. Accordingly, the court denied BellSouth's request for declaratory and injunctive relief and dismissed the cases.

II.

BellSouth made with e.spire Communications, Inc., and Intermedia Communications, Inc. e.spire settled its dispute with BellSouth before BellSouth brought these appeals, and Intermedia settled with BellSouth shortly after we heard oral argument.

18

As aforementioned, the district court based its jurisdiction over this dispute on 47 U.S.C. § 252(e)(6), which provides: "In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section." The court explicitly held that the disputed GPSC orders were state commission "determinations" made pursuant to section 252 of the 1996 Act. In doing so, however, the district court had to draw two other conclusions, neither of which it mentioned in its dispositive order: first, that the GPSC had the authority to adjudicate the dispute between BellSouth and the CLEC defendants, and second, that this authority derived from section 252 of the 1996 Act. As the following discussion indicates, we disagree with not only the latter, but also the former, of these premises. Instead, we find that the GPSC had no jurisdiction to issue the orders in this case under the federal and state statutory bases it cited in its orders.[13]

_____

[13] Under section 23 of the BellSouth-MCImetro Agreement, "the parties agree[d] that any dispute arising out of or relating to this Agreement that the parties themselves cannot resolve, may be submitted to the Commission for resolution." While we acknowledge that parties are free to predetermine a forum for dispute resolution, there is no indication in the record that the GPSC based its jurisdiction to resolve the dispute between BellSouth and MCImetro on section 23. Moreover, section 23 indicates that both parties were under the mutual and mistaken

19

A.

To determine whether the GSPC's orders constitute "determinations" under section 252 of the 1996 Act, we first look for plain meaning in the pertinent language of that statute. "Our inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" Robinson v. Shell Oil Co., 519 U.S. 337, 340, 117 S. Ct 843, 846, 136 L. Ed. 2d 808 (1997) (quoting United States v. Ron Pair Enters., 489 U.S. 235, 240 (1989)). As best we can tell,[14] the GPSC rooted its authority under the 1996 Act in 47 U.S.C. § 252(e)(1), which provides:

> Any interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission. A State commission to which an agreement is submitted shall approve or reject the agreement, with written findings as to any deficiencies.

The plain meaning of this statutory subsection, however, grants state commissions, like the GPSC, the power to approve or reject interconnection agreements, not to

---

impression that "the Commission ha[d] continuing jurisdiction to implement and enforce all terms and conditions of th[e] Agreement." Consequently, we do not consider that the GPSC acted under any sort of contractual authority when it issued its order interpreting the BellSouth-MCImetro Agreement.

[14] In neither of the disputed orders did the GPSC indicate the particular subsection of 47 U.S.C. § 252 that it perceived to be the basis for its jurisdiction. Instead, the commission simply claimed that it had "authority and jurisdiction over [each] matter pursuant to the Telecommunications Act of 1996."

20

interpret or enforce them. It would seem, therefore, that the 1996 Act does not permit a State commission, like the GPSC, to revisit an interconnection agreement that it has already approved, like the ones in this case.

Subsection 252(e)(6) of the 1996 Act lends further credence to this interpretation. That subsection provides that "[i]n any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement . . . meets the requirements of section 251 of this title and this section." 47 U.S.C. § 252(e)(6). If section 252 truly provided state commissions with the authority to interpret interconnection agreements, then subsection 252(e)(6) would imply that federal courts have the right to review their decisions. If that were the case, one would expect the district court to review the commission's construction of the agreement under the applicable state contract law -- as the district court did in the instant case. The statute, however, only permits the district court to review whether the agreement, as construed, meets the requirements of the 1996 Act. A more harmonious interpretation of subsection 252(e)(6) arises if the 1996 Act is read as only giving state commissions the right to approve or reject interconnection agreements. Under this construction of the statute, federal courts would only need to determine whether the interconnection

agreements meet the requirements of section 251 and 252, because that would be the only information that state commissions consider in reaching their decisions.

Despite this seemingly overwhelming evidence to support the plain meaning of 47 U.S.C. § 252, those circuit courts of appeal that have previously addressed whether state commission decisions have authority under the 1996 Act to interpret previously approved interconnection agreements have reached split decisions. Some courts have either held that state commission decisions interpreting interconnection agreements are not determinations pursuant to section 252, see Bell Atlantic Maryland v. MCI WorldCom, 240 F.3d 279, 301-07 (4th Cir. 2001),[15] or ducked the question altogether.  See Puerto Rico Tel. Co. v. Telecommunications Regulatory Bd. of Puerto Rico, 189 F.3d 1, 10-13 (1st Cir. 1999) ("Several courts have held that interpretations and enforcements of [interconnection] agreements are implicitly covered by § 252 and so are covered by § 252(e)(6).  We need not and do not decide this issue . . . .") (citations omitted). Others have concluded "that the Act's grant to the state commissions of plenary authority to approve or disapprove these interconnection agreements necessarily carries with it the authority to interpret and enforce the provisions of agreements

---

[15] The Fourth Circuit in Bell Atlantic Maryland did note in dicta that it believed that "State commissions have authority to interpret and enforce interconnection agreements," but cited state law, specifically Md. Code Ann., Pub. Util. Cos. § 2-113, rather than section 252, as the basis for such authority.  Bell Atlantic Maryland, 240 F.3d at 304.

that state commissions have approved." Southwestern Bell Tel. Co. v. Public Util. Comm'n of Texas, 208 F.3d 475, 479-80 (5th Cir. 2000); see Southwestern Bell Tel. Co. v. Brooks Fiber Communications of Oklahoma, Inc., 235 F.3d 493, 496-97 (10th Cir. 2000); see also Illinois Bell Tel. v. WorldCom Techs., Inc., 179 F.3d 566, 570-71 (7th Cir. 1999) (holding that a district court had jurisdiction under 252(e)(6) to review a state commission order interpreting a interconnection agreement).[16]

Courts, which have eschewed the plain meaning of section 252 and held that state commissions have authority under the 1996 Act to interpret and enforce interconnection agreements, have used language from FCC rulings to support their decisions. The Fifth Circuit in Public Utility Commission, for example, cited the FCC's now-vacated ruling in Implementation of the Local Competition Provisions in the Telecommunications Act of 1996 and Inter-Carrier Compensation for ISP-Bound Traffic [hereinafter Inter-Carrier Compensation for ISP-Bound Traffic], 14

---

[16] Even though the Seventh Circuit in Illinois Bell did not expressly consider whether state commissions have the authority to interpret previously approved interconnection agreements, both the Fifth Circuit and the FCC have referenced the opinion as support for that notion. See Public Util. Comm'n, 208 F.3d at 480; 15 F.C.C.R. 11,277 ¶ 6 n.13. Specifically, they cite two sections of dicta from the Illinois Bell opinion: one allegedly noting that a state commission "was doing what it was charged with doing" when it determined contractual intent under interconnection agreements, Illinois Bell, 179 F.3d at 573, quoted in Public Util Comm'n, 208 F.3d at 480, and the other emphasizing that "the Act specifically provides state commissions with an important role to play in the field of interconnection agreements." Illinois Bell, 179 F.3d at 574, quoted in 15 F.C.C. 11,277 ¶ 6 n.13.

F.C.C.R. 3689 (1996).[17]  See Public Util. Comm'n., 208 F.3d at 480.  In that

ruling, the FCC did not directly address whether state commissions have authority

under the 1996 Act to interpret interconnection agreements, but used language

suggesting that it was operating under the assumption that state commissions had

such authority. For instance, the FCC noted that parties are bound by

interconnection agreements "as interpreted and enforced by the state

commissions," id. ¶ 22, and it discussed factors state commissions should use in

"construing the parties' agreements."  Id. ¶ 24.  Based on this dicta, the Fifth

Circuit "believe[d] that the FCC plainly expects state commissions to decide

intermediation and enforcement disputes that arise after the approval procedures

are complete," Public Util. Comm'n, 208 F.3d at 480, and held "that [a state

commission] acted within its jurisdiction in addressing . . . questions pertaining to

interpretation and enforcement of . . . previously approved interconnection

agreements."  Id.; see also Illinois Bell, 179 F.3d at 571-73 (relying on Inter-

Carrier Compensation for ISP-Bound Traffic in holding that state commissions had

---

[17] In Bell Atlantic Tel. Cos. v. FCC, 206 F.3d 1 (D.C. Cir. 2000), the court of appeals vacated the FCC's ruling in Inter-Carrier Compensation for ISP-Bound Traffic, "[b]ecause the Commission [did] not provide[] a satisfactory explanation why LECs that terminate calls to ISPs are not properly seen as 'terminating . . . local telecommunications traffic,' and why such traffic is 'exchange access' rather than 'telephone exchange service.'"  Id. at 9.

24

the authority to resolve disputes over reciprocal compensation of ISP-bound traffic).

The Tenth Circuit relied on another FCC ruling, In re Starpower Communications, 15 F.C.C.R. 11,277 (2000) [hereinafter Starpower Communications], as support for its holding in Brooks Fiber that state commissions have jurisdiction under section 252 to interpret previously approved interconnection agreements. See Brooks Fiber, 235 F.3d at 497. In Starpower Communications, the FCC, in contrast to its ruling in Inter-Carrier Compensation for ISP-Bound Traffic, expressly considered "whether a dispute arising from interconnection agreements and seeking interpretation and enforcement of those agreements is within the states' 'responsibility' under section 252." 15 F.C.C.R. 11,277 ¶ 6. "[F]ind[ing] federal court precedent to be instructive," it concluded that "inherent in state commissions' express authority to mediate, arbitrate, and approve interconnection agreements under section 252 is the authority to interpret and enforce previously approved agreements." Id. Strangely, the federal precedents that the FCC found to be so instructive were the aforementioned cases, Public Utility Commission and Illinois Bell, see 15 F.C.C.R. 11,277 ¶ 6 n.13, which relied on the FCC's dicta in Inter-Carrier Compensation for ISP-Bound Traffic to reach their own conclusions. In essence, Starpower Communications

25

represented the proverbial case of the dog chasing its tale:  For its determination, the FCC relied on case law, which had, in turn, relied on now-vacated dicta of the FCC.  Nowhere in this line (or more appropriately, circle) of decisions did either a court or the FCC put forth a well-reasoned rationale for state commission authority to interpret interconnection agreements, choosing instead to follow what they believed the other had said.  Despite this absence of logical underpinnings, the Tenth Circuit in Brooks Fiber nevertheless chose to "defer to the FCC's view" and adopt the FCC's conclusion that state commissions had jurisdiction under subsection 252(e)(6) to interpret previously approved interconnection agreements. Brooks Fiber, 235 F.3d at 497.

While this court is not bound by decisions of other circuits, we are required to give due deference to decisions of administrative agencies, like the FCC – provided the proper conditions are met.  Those conditions, enumerated by the Supreme Court in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984), are twofold.  First, we must determine whether Congress has directly spoken through statutory language to the issue at hand.  If it has, then our inquiry ends and we must give effect to Congress' intent.  See id. at 843, 104 S. Ct. at 2781.  If, however, "the statute is silent or ambiguous with respect to the specific issue," the court must

secondly ask "whether the agency's answer is based on a permissible construction of the statute." Id. at 843, 104 S. Ct. at 2782. To be permissible, an agency's interpretation of a statute must be reasonable, and not "arbitrary, capricious, or manifestly contrary to the statute." Id. at 844, 104 S. Ct. at 2782. If the agency's interpretation is reasonable, the courts must defer to it rather than form their own construction of the statute.

In this case, the statute in question, the Federal Telecommunications Act of 1996, is silent as to whether state commissions have the authority to interpret previously approved interconnection agreements. If the FCC reasonably construed the 1996 Act as providing such authority, this court would have no choice but to defer to this statutory construction, because "[47 U.S.C.] § 201(b) explicitly gives the FCC jurisdiction to make rules governing matters to which the 1996 Act applies." AT&T Corp., 525 U.S. at 380 (emphasis in original). The FCC has not yet made this type of "reasonable" analysis, though. In Starpower Communications, the only decision in which the FCC has expressly considered whether state commissions have authority to interpret and enforce interconnection agreements under section 252 of the 1996 Act, the FCC did not derive its own construction of section 252, but instead relied blindly upon those allegedly done by two federal courts:

> In applying Section 252(e)(5), we must first determine whether a dispute arising from interconnection agreements and seeking interpretation and enforcement of those agreements is within the states' "responsibility" under section 252. We conclude that it is. In reaching this conclusion, we find federal court precedent to be instructive. Specifically, at least two federal courts of appeal have held that inherent in state commissions' express authority to mediate, arbitrate, and approve interconnection agreements under section 252 is the authority to interpret and enforce previously approved agreements. These court opinions implicitly recognize that, due to its role in the approval process, a state commission is well-suited to address disputes arising from interconnection agreements. Thus, we conclude that a state commission's failure to "act to carry out its responsibility" under section 252 can in some circumstances include the failure to interpret and enforce existing interconnection agreements.

Starpower Communications, 15 F.C.C.R. 11,277 ¶ 6. As previously discussed, however, those courts – the Fifth Circuit in Public Utility Commission and the Seventh Circuit in Illinois Bell – relied on dicta in the FCC's now-vacated ruling in Inter-Carrier Compensation for ISP-Bound Traffic to reach their conclusions. Hence, the grounds on which the FCC rested in Starpower Communications for its supposed "interpretation" (if it could be called that) of section 252 could hardly be described as "reasonable." We therefore feel no need to be bound by the agency's decision.

We instead choose to interpret section 252 in a manner more consistent with the clear meaning of the statute. See Johnson v. United States R.R. Retirement Bd., 925 F.2d 1374, 1378 (11th Cir. 1991) ("Though an agency's interpretation of

the statute under which it operates is entitled to some deference, this deference is limited by our responsibility to honor the clear meaning of a statute, as revealed by its language, purpose, and history.") Congress passed the 1996 Act based on a "belief that more competition, rather than more regulation, will benefit all [local telephone] consumers." H.R. Rep. No. 101-204, at 50, reprinted in 1996 U.S.C.C.A.N. 10, 14. Not surprisingly, an integral part of this legislation was the repeal of a section of the 1934 Federal Communications Act that gave state commissions exclusive jurisdiction over local telephone service. Admittedly, the 1996 Act "provide[d] state commissions with an important role to play in the field of interconnection agreements," Illinois Bell, 179 F.3d at 574, as Congress granted state commissions the power to arbitrate and approve or reject interconnection agreements, if they chose to use it. Nevertheless, it would seem contrary to Congress' express intent to curtail state commission authority if we expand the power of state commissions beyond what Congress explicitly provided and, moreover, beyond the scope of their administrative expertise.

If we allowed state commissions to interpret and enforce interconnection agreements, we would be opening the floodgates for them to regulate local telephone service -- in direct contradiction to the stated purpose of the 1996 Act. State commissions are not bound by the strictures of judicial process and

procedure, and Congress has provided no guidelines in the 1996 Act for interpreting interconnection agreements.  Hence, the commissioners, who are selected for their expertise in the quasi-legislative task of rule-making and not for their knowledge in the legal art of contract interpretation, would be free to construe agreements as they saw fit.  So long as the commissioners' decisions did not directly conflict with the broad terms of the 1996 Act, they would be immune to judicial review -- even if they violated the most basic tenets of contract interpretation -- since review under 47 U.S.C. § 252(e)(6) is limited to "determin[ing] whether the [interconnection] agreement meets the requirements of [47 U.S.C. §§ 251 and 252]."

We cannot accept the proposition that Congress would pass a statute stripping state commissions of their jurisdiction to regulate local telephone service but then, in the same statute, give them back that power in another form. Consequently, we cannot countenance such a reading of the 1996 Act.  See Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 333, 59 S. Ct. 191, 200, 83 L. Ed. 195 (1938) ("[T]o construe statutes so as to avoid results glaringly absurd, has long been a judicial function.").  We instead adopt a reading of the statute more consistent with its plain meaning and intent, specifically that

state commissions, like the GPSC, are not authorized under section 252 to interpret interconnection agreements.

## B.

Having determined that the GPSC has no power under federal law to interpret the interconnection agreements, we must now consider whether there is some other appropriate basis for the GPSC to interpret these agreements. In the orders currently disputed before the court, the GPSC cites two such alternative bases for its jurisdiction: (1) the Telecommunications and Competition Development Act of 1995 (the "Georgia Act"), Ga. Code Ann. §§ 46-5-160 to -174 (Supp. 2001), and (2) "its general authority over companies subject to its jurisdiction." As we shall discuss, though, neither provides the GPSC with authority to adjudicate a contractual agreement between two corporate entities.

## 1.

Even though the Georgia legislature passed the Telecommunications and Competition Development Act of 1995 (the "Georgia Act"), Ga. Code Ann. §§ 46-

31

5-160 <u>et seq.</u> (Supp. 2001), one year before the Federal Telecommunications Act, the stated goals of the former mirror those of the latter. To wit, the Georgia Act was enacted "to establish a new regulatory model for telecommunications services in Georgia to reflect the transition to a reliance on market based competition as the best mechanism for the selection and provision of needed telecommunications services at the most efficient pricing." <u>Id.</u> § 46-5-161(a)(1). The administrative body charged with implementing the Georgia Act and thus effectuating this mandate is the GPSC.

According to the Georgia Act, the GPSC's jurisdiction "shall be construed to include the authority necessary to implement and administer the express provisions of [the Georgia Act] through rule-making proceedings and orders in specific cases." <u>Id.</u> § 46-5-168(a). The statute actually enumerates several examples of the GPSC's authority, including, for instance, the power to "[a]dopt reasonable rules governing service quality" and to "[r]esolve complaints against a local exchange company regarding that company's service." <u>Id.</u> § 46-5-168(b).[18] Nowhere,

_____

[18] Read in its entirety, section 46-5-168(b) of the Georgia Code provides that "[t]he commission's jurisdiction shall include the authority to:
  (1) Adopt reasonable rules governing certification of local exchange companies;
  (2) Grant, modify, impose conditions upon, or revoke a certificate;
  (3) Establish and administer the Universal Access Fund including modifications to the maximum allowable charge for basic local exchange service;
  (4) Adopt reasonable rules governing service quality;
  (5) Resolve complaints against a local exchange company regarding

32

however, is the GPSC given the power to adjudicate contractual disputes between LECs.  Instead, the Georgia Act simply allows the GPSC to adopt rules and impose conditions for the public good.

To interpret Georgia statutes, courts use "the 'golden rule' of statutory construction, which requires [courts] to follow the literal language of the statute 'unless it produces contradiction, absurdity or such an inconvenience as to insure that the legislature meant something else.'"  Telecom*USA, Inc. v. Collins, 393 S.E.2d 235, 237 (1990) (quoting Department of Transp. v. City of Atlanta, 337 S.E.2d 327, 337-38 (1985) (Clarke, J. concurring)).  The Georgia Act empowers the GPSC to "implement" and "administer" its provisions.  These verbs have similar connotations, namely that the GPSC is obligated "to give practical effect to" and "to direct . . . the execution . . . of" the Georgia Act.  Webster's Third New

---

that company's service;
    (6) Require a telecommunications company electing alternative regulation under this article to comply with the rate adjustment provisions of this article;
    (7) Approve and if necessary revise, suspend, or deny tariffs in accordance with the provisions of this article;
    (8) If necessary, elect another comparable measurement of inflation calculated by the United States Department of Commerce;
    (9) Establish reasonable rules and methodologies for performing cost allocations among the services provided by a telecommunications company; and
    (10) Direct telecommunications companies to make investments and modifications necessary to enable portability.

International Dictionary 27, 1134 (1993).[19]  Especially when read in conjunction

with those duties of the GPSC that are explicitly mentioned in the statute -- for

example, making rules regarding service quality and issuing certificates of

authority -- this language indicates that the GPSC should play a ministerial and

even quasi-legislative role within the statutory scheme, but provides no such

support for any adjudicatory powers.

Another section of the Georgia Act underscores this distinction.  Section 46-

5-168(f) of the Georgia Code allows the GPSC "the authority to petition, intervene,

or otherwise commence proceedings before the appropriate federal agencies and

courts having specific jurisdiction over the regulation of telecommunications

seeking to enhance the competitive market for telecommunications services within

the state."  There would be no need for the GPSC to "commence" proceedings in a

court of law, however, if it had the authority to adjudicate those proceedings itself.

The statute, therefore, contemplates occasions on which the GPSC would not be

the proper forum to adjudicate disputes relating to telecommunications.

Such an occasion arises in the case at hand.  Nothing in the Georgia Act

gives the GPSC the right to interpret a contract between two parties, just because

---

[19] According to Webster's Third New International Dictionary, to "administer" is "to direct or superintend the execution, use or conduct of," id. at 27, while to "implement" is "to give practical effect to and ensure of actual fulfillment by concrete measures." Id. at 1134.

the two parties happen to be certified telecommunications carriers. The reason for this exclusion is probably as much practical as it is legal. The Georgia Act requires the GPSC to consider such factors as cost-efficiency and the public good when it conducts rule-making proceedings. See Ga. Code Ann. § 46-5-168(d) (Supp. 2001).[20] Construing the terms of contracts, like the interconnection agreements in this case, is a purely legal exercise that does not require consideration of these factors and thus falls outside of the commission's expertise. Without explicit statutory instructions to the contrary, it would be inappropriate for this court to find that the Georgia legislature intended that a question of law should be answered by an unqualified body like the GPSC and not by a court. We cannot construe the Georgia Act in such a way. See Tuten v. City of Brunswick, 418 S.E.2d 367, 370 (Ga. 1992) ("The construction [of statutes] must square with common sense and sound reasoning.") (alteration in original) (quoting Blalock v. State, 143 S.E. 426,

---

[20] Section 46-5-168(d) of the Georgia Code specifically provides that the GPSC should consider the following factors in conducting any rule-making proceeding:
   (1) The extent to which cost-effective competitive alternatives are available to existing telecommunications networks and services; and
   (2) Requirements necessary to prevent any disadvantage or economic harm to consumers, protect universal affordable service, establish and maintain an affordable Universal Access Fund, protect the quality of telecommunications services, prevent anticompetitive practices, and prevent abandonment of service to areas where there is no competing provider of telecommunications service.

35

428 (Ga. 1928)).  Accordingly, we hold that the Georgia Act provides no authority for the GPSC to interpret the interconnection agreements in this case.

## 2.

The third, and final, justification the GPSC lists for its authority to interpret the interconnection agreements between BellSouth and the CLEC defendants is "its general authority over companies subject to its jurisdiction."  In other words, the GPSC contends that it has specific jurisdiction in this case, because of an alleged general jurisdiction over telephone companies – though it fails to cite any statutory basis for such overarching power.

Of course, the GPSC cannot provide any basis for such power, because none exists.  It is true that Georgia law, specifically section 46-2-20(a) of the Georgia Code, provides that "the commission shall have the general supervision of all [public utilities including] telephone and telegraph companies."  There are limits to this power, however.  Georgia courts have long recognized, for example, that telephone companies and other so-called "public" utilities have the right to be free of GPSC purview when they act as private entities and enter into contracts with each other:

The fact that a business or enterprise is, generally speaking, a public utility, does not make every service performed or rendered by it a public service, but it may act in a private capacity as distinguished from its public capacity, and in so doing is subject to the same rules as a private person. . . . Public utilities have the right to enter into contracts between themselves or with others, free from the control or supervision of the State, so long as such contracts are not unconscionable or oppressive and do not impair the obligation of the utility to discharge its public duties.

Georgia Power Co. v. GPSC, 85 S.E.2d 14, 18 (Ga. 1954) (citations omitted); see also Atlanta Gas Light Co. v. GPSC, 185 S.E.2d 403, 405-06 (Ga. 1971) (quoting Georgia Power Co. but concluding that a public utility's contract to provide total energy service to two high-rise buildings was subject to GPSC regulation because it involved furnishing a utility to the public ).  In the case at hand, the interconnection agreements formed between BellSouth and the CLEC defendants, while compelled by federal law, were basic corporate contracts and did not directly impact provision of local telephone service to the public.  They, therefore, do not fall within the GPSC's jurisdiction, as defined by Georgia law.[21]

There are functional reasons for excluding interpretation of these contracts from the GPSC's jurisdiction.  The GPSC is a quasi-legislative body charged with ensuring that utility rates are set appropriately and public services are provided

_____

[21] The GPSC's jurisdiction is established at Ga. Code Ann. §§ 46-2-20 (1992), 46-5-168 (Supp. 2001).  Nothing in this statutory framework gives the GPSC the power to interpret contracts such as the ones involved in these cases.

fairly. See, e.g., GPSC v. ALLTEL Ga. Communications Corp., 489 S.E.2d 350, 383 (Ga. Ct. App. 1997) ("[T]he [G]PSC has general jurisdiction to make a quasi-legislative determination of just and reasonable rates."). For this reason, courts give deference to the GPSC's orders on matters, like rate-setting, that fall within its distinct area of expertise:

> [R]atemaking is a legislative function which the Constitution of this state has both authorized and required the Legislature to delegate to the members of the Commission. To this extent, and to this extent only, the Commission is constitutionally charged as a lawmaking body, and so long as it does not itself act in an unconstitutional manner the courts do not have any right to interfere.

Southern Bell Tel. & Tel. Co. v. Invenchek, Inc., 204 S.E.2d 457, 459 (Ga. Ct. App. 1974); see Southern Bell Tel. & Tel. Co. v. GPSC, 49 S.E.2d 38, 61 (Ga. 1948) ("The function of making telephone rates is legislative in nature, and such rates can not be judicially fixed by courts."). Contract interpretation is not an area within the GPSC's expertise, however. It would be grossly unwarranted to suggest that a quasi-legislative body, like the GPSC, would be better suited than a court to answer the strictly legal questions of contract interpretation.

Of course, until the 1996 Act was enacted, this point was somewhat moot, as telecommunications regulation involved rate-setting and not contract interpretation. The regulatory paradigm for local telephone service at that time was based on the monopolies enjoyed by the incumbent LECs. Since there was no competition

38

among LECs, there were no conflicts and thus no need for either contractual agreements or judicial interpretation of those agreements. The 1996 Act altered this regulatory landscape. With the advent of federally mandated interconnection agreements, courts must be ready to interpret these contracts should the need arise. At the same time, public commissions, like the GPSC, should recognize when telecommunications issues arise that do not fall within either their expertise or their legislative charge.

As telecommunications law shifts from a framework based on governmental regulation to one modeled on free market competition, the bodies charged with effectuating this change -- both administrative and judicial -- must be similarly flexible. In this case, neither the district court nor the GPSC met this challenge and recognized that the conflict between BellSouth and the CLEC defendants should be resolved in a court of law and not by the commission. As a result, we must reverse the district court's order affirming the GPSC's decision, as we find that the GPSC had no authority to issue its decision in the first place.

III.

Having determined that the GPSC's orders were invalid, we turn to appellant's other question -- whether the district court acted properly when it dismissed the GPSC commissioners sua sponte under Rule 21 of the Federal Rules of Civil Procedure.[22]  In dismissing the commissioners, who were sued individually and in their official capacity, the district court utilized a two-step analysis:  It first determined that "neither the [G]PSC nor its members need[ed] [to] be parties to these suits for the court to exercise jurisdiction," and then, looking at the relief BellSouth sought, concluded that the commissioners "[were] neither necessary nor indispensable parties and that their presence in the instant actions pose[d] problematic constitutional questions that [were] best avoided."   The district court's logic was somewhat flawed, because the court wrongly believed that it had jurisdiction under 47 U.S.C. § 252(e)(6).  Nevertheless, we agree with the court's overall conclusion, as the commissioners' presence in the case is unnecessary for the only type of relief available to BellSouth: a declaratory judgment that the GPSC's orders are void for lack of jurisdiction.  To illustrate this point, we consider BellSouth's three claims for relief -- judicial review of the GPSC's orders,

_____

[22] Fed. R. Civ. P. 21 provides in pertinent part:
Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just.  Any claim against a party may be severed and proceeded with separately.

a declaratory judgment interpreting the interconnection agreements, and an injunction against the GPSC commissioners -- in turn.

## A.

In its first claim for relief, BellSouth seeks federal review and reversal of the GPSC's orders requiring it to compensate the CLEC defendants for ISP-bound telephone calls. BellSouth believes that it is entitled to judicial review of the GPSC's orders "[p]ursuant to 28 U.S.C. §§ 2201 and 2202, and 47 U.S.C. § 252(e)(6)." 47 U.S.C. § 252(e)(6), as we have noted, provides that, "[i]n any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section." We decided in part I.A of this opinion, however, that the GPSC did not have jurisdiction under section 252 to interpret the interconnection agreements between BellSouth and the CLEC defendants and thus to issue the orders to that effect. Therefore, those orders cannot be considered determinations under section 252, and the district court had no jurisdiction to review them substantively under subsection 252(e)(6).

41

Obviously, both the district court and this court nevertheless have federal question jurisdiction under 28 U.S.C. § 1331 to review the orders for their validity: Whether or not the GPSC has authority under the Federal Telecommunication Act of 1996 to interpret interconnection agreements is clearly an issue that "arise[s] under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331; see Shaw v. Delta Air Lines, Inc., 463 U.S. 84, 96 n.14, 103 S.Ct. 2890, 2899, 77 L. Ed. 2d. 490 (1983) ("It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights.")  Because we have such jurisdiction, this court can issue a declaratory statement under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, regarding the validity of the orders.  See McDougald v. Jenson, 786 F.2d 1465, 1476 (11th Cir. 1986) ("[I]f the federal issue [presented in a declaratory judgment action] would inhere in the claim on the face of the complaint that would have been presented in a traditional . . . coercive action, then federal jurisdiction exists over the declaratory judgment action.") (alteration in original) (citation omitted).  Therefore, we declare today that the orders issued by the GPSC in the disputes between BellSouth and the CLEC defendants are void, because the GPSC lacked the jurisdiction to issue them.

B.

42

BellSouth has also asked this court to issue declaratory judgments pursuant to 28 U.S.C. §§ 2201 and 2202 that:

a)      calls transmitted through an ISP over the Internet are interstate in nature and are not local traffic

b)      the terms of the Interconnection Agreement[s] between BellSouth and [the CLEC defendants] do not require BellSouth to pay reciprocal compensation for telecommunications traffic to an end user of [the CLEC defendants] that is also an ISP; and

c)      the [G]PSC is without jurisdiction to convert interstate traffic, over which the FCC has exclusive jurisdiction, into local traffic.

As we intimated in the previous subsection, however, "the operation of the Declaratory Judgment Act is procedural only," Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240, 57 S.Ct. 461, 463, 81 L.Ed. 617 (1937), and 28 U.S.C. §§ 2201 and 2202 cannot serve as independent sources for subject matter jurisdiction. See Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671-74, 70 S.Ct. 876, 878-89, 94 L.Ed. 1194 (1950). Consequently, before we can address any of the issues on which BellSouth seeks a declaratory judgment, we must determine whether those issues are ones that "arise under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

The first two matters that BellSouth would like us to address are, first, whether ISP-bound telephone calls are local traffic, and second, whether LECs are

entitled to reciprocal compensation for them.  Answering either of these questions

necessarily involves contract interpretation.  According to the interconnection

agreements, LECs do not receive reciprocal compensation for telephone calls

unless they are "local traffic"  -- as that term is defined by the agreements.  To

determine whether ISP-bound calls are "local traffic," therefore, we would need to

analyze the agreements' definition of that term using Georgia law, the law chosen

by the parties for interpretation of their contracts.

In effect, BellSouth's claim, while crafted as one for declaratory judgment

under federal law, is no different than a state-law claim for breach of contract.  We

recognized in City of Huntsville v. City of Madison, 24 F.3d 169 (11th Cir. 1994),

"that a declaratory judgment plaintiff . . . may only claim federal question

jurisdiction if the anticipated lawsuit by the declaratory judgment defendant . . .

arises under federal law."  Id. at 172.  In the instant case, BellSouth would like us

to declare that it has not breached the interconnection agreements, which it signed

with the CLEC defendants, by refusing to compensate them for ISP-bound calls.

But "[i]f [the CLEC defendants] sought damages from [BellSouth] or specific

performance of their contracts, [they] could not bring suit in a United States

District Court on the theory that [they were] asserting a federal right.  And for the

simple reason that such a suit would 'arise' under the State law governing the

44

contracts." Skelly Oil Co., 339 U.S. at 672, 70 S. Ct. at 879. Similarly, BellSouth cannot use the Declaratory Judgment Act to bring suit in a federal court to show that it does not owe the CLEC defendants any such damages or specific performance under the same contract law.

One could argue that BellSouth asserts a federal question in this case by seeking to clarify its rights under federally mandated contracts, i.e., interconnection agreements required by the 1996 Act. In Jackson Transit Auth. v. Local Div. 1285, 457 U.S. 15, 102 S. Ct. 2202, 72 L. Ed. 2d 639 (1982), the Supreme Court held that a contract enforcement action stated a federal claim, "if Congress intended that [the contracts] . . . be 'creations of federal law,' . . . and that the rights and duties contained in those contracts be federal in nature. Id. at 23, 102 S. Ct. at 2207 (quoting Machinists v. Central Airlines, Inc., 372 U.S. 682, 692, 83 S. Ct. 956, 962, 10 L. Ed. 2d 67 (1963)). The interconnection agreements signed by BellSouth and the CLEC defendants are indeed creations of federal law – namely, the 1996 Telecommunications Act – and do contain federal rights and duties – specifically, those enumerated in section 251 of that Act. The relief that BellSouth seeks, however, does not require resolution of any question involving the 1996 Act or the rights and duties contained therein: It is a simple matter of common law contract interpretation.

To elaborate, the Supreme Court in <u>Franchise Tax Board v. Construction Laborers Vacation Trust</u>, 463 U.S. 1, 103 S. Ct. 2841, 77 L. Ed.2d 420 (1983), held that a case might "arise under" federal law, even though state law creates the cause of action, "if a well-pleaded complaint established that its right to relief under state law requires resolution of a substantial question of federal law in dispute between the parties." <u>Id.</u> at 13, 103 S. Ct. at 2849. This basis for federal jurisdiction was narrowed even further by the Court in <u>Merrell Dow Pharmaceuticals Inc. v. Thompson</u>, 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986). In that case, the Court held that "a complaint alleging a violation of a federal statute as an element of a state cause of action, when Congress has determined that there should be no private, federal cause of action for the violation, does not state a claim 'arising under the Constitution, laws, or treaties of the United States.'" <u>Id.</u> at 817, 106 S. Ct. at 323 (quoting 28 U.S.C. § 1331). This circuit has hesitated to adopt the language of <u>Merrell Dow</u> as a bright-line rule for fear of eviscerating the holding of <u>Franchise Tax Board</u>, but nevertheless has held "that it will be only the exceptional federal statute that does not provide for a private remedy but still raises a federal question substantial enough to confer federal question jurisdiction when it is an element of a state cause of action." <u>City of Huntsville</u>, 24 F.3d at 174.

46

Today, we need not delve into the vagaries of harmonizing Merrell Dow with Franchise Tax Board, though, because neither provides a basis for federal jurisdiction over BellSouth's quasi-contractual declaratory judgment actions. As we have noted, adjudication of the dispute between BellSouth and the CLEC defendants does not require "resolution of a substantial question of federal law," but merely interpretation under Georgia law of the term, "local traffic," as it is used in the interconnection agreements between the two parties. Moreover, the Telecommunications Act of 1996 does not provide a private right of action for interpretation of previously approved interconnection agreements. It simply allows aggrieved parties to appeal to federal district courts if they are unhappy with a state commission's approval or rejection of an interconnection agreement.

In summary, the district court had no justification for exercising its federal jurisdiction to interpret the agreements between BellSouth and the CLEC defendants and therefore cannot do so -- even in the context of a declaratory judgment action. Therefore, the district court could not issue the first two declarations BellSouth requests. The third declaration BellSouth seeks -- that the GPSC does not have the power to convert interstate traffic into local traffic -- did not require the district court to interpret the interconnection agreements, but is moot in light of our previous finding rendering the GPSC orders invalid for lack of

jurisdiction. See Connell v. Shoemaker, 555 F.2d 483, 486 (5th Cir. 1977) ("[T]he question of the mootness vel non of [a] claim under the Declaratory Judgment Act, 28 U.S.C. § 2201, [is] 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issue of a declaratory judgment.'") (quoting Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S. Ct. 510, 512, 85 L. Ed. 826 (1941)). As a result, the district court could not grant BellSouth any of the declaratory judgment relief that it sought in its second claim for relief, regardless of whether the GPSC is a party to this litigation.

C.

In its third and final claim for relief, BellSouth seeks an injunction "enjoining the Defendants from enforcing the [G]PSC order[s]." It is not clear whether BellSouth would like the CLEC defendants or the commissioners -- or both of these two groups of defendants -- enjoined. It matters little, however, because, regardless of which defendants BellSouth would like enjoined, such action is not necessary. Given our decision that the commission lacked the jurisdiction to interpret the interconnection agreements at issue, its orders are

48

nothing more than dead letters.  Consequently, the parties will either settle their disputes amicably or seek relief in Georgia superior court, the state court of general jurisdiction.[23]

IV.

For the reasons we have stated, the judgment of the district court is REVERSED.

---

[23] Now that the GPSC and its commissioners -- all residents of Georgia -- have been dismissed as parties, diversity may exist between BellSouth -- a Georgia corporation -- and the CLEC defendants, and a federal district court may have jurisdiction to resolve this dispute under 28 U.S.C. § 1332.  The parties, however, would first need to show that the statutory prerequisites for diversity jurisdiction -- total diversity between the plaintiff and the defendant(s) and an amount in controversy greater than $75,000 -- have been met.

BARKETT, Circuit Judge, dissenting:

I respectfully dissent because I believe that the authority granted under 47 U.S.C. § 252 (e)(1) to state commissions to "approve or reject" interconnection agreements "with written findings as to any deficiencies," includes the authority to interpret and enforce those agreements. I agree with the determinations of the First, Fourth, Fifth, Seventh, Eighth and Tenth Circuits in this regard. See Puerto Rico Tel. Co. v. Telecomm. Regulatory Bd. of Puerto Rico, 189 F.3d 1, 10-13 (1st Cir. 1999); Bell Atlantic Maryland v. MCI WorldCom, 240 F.3d 279, 304-05 (4th Cir. 2001); Southwestern Bell Tel. Co. v. Public Util. Comm'n, 208 F.3d 475, 479-480 (5th Cir. 2000); Illinois Bell Tel. Co. v. Worldcom Techs., Inc., 179 F.3d 566, 571-72 (7th Cir. 1999); Iowa Util. Bd. v. F.C.C., 120 F.3d 753, 804 (8th Cir. 1997), rev'd on other grounds, AT & T v. Iowa Util. Bd., 522 U.S. 1089 (1998); Southwestern Bell Tel. Co. v. Brooks Fiber Optic Comm'n of Oklahoma, Inc., 235 F.3d 493, 497 (10th Cir. 2000). Thus, I believe that the Georgia Public Service Commission ("GPSC") had the authority to accept, reject, interpret and enforce the agreements of the parties and, moreover, that under 47 U.S.C. § 252 (e)(6) the GPSC's interpretations of the agreements were "determinations" subject to federal court review in this case. Accordingly, I believe the panel should have resolved the various merits issues raised by this appeal.

50